Monica MADANES, Plaintiff,

v.

Pablo MADANES; Miguel Madanes; Leiser Madanes; Richard Ortoli; Rubin & Bailin; Rubin, Kalnick, Bailin, Ortoli, Abady & Fry, P.C.; Baltimore Ltd.; Swansea Holding, Inc.; Transmarketing and Product Research Co. Panama; Procida, Ltd., a/k/a Pegaso Ltd.; and Does 1–10, Defendants.

No. 96 CIV. 6398(LBS).

United States District Court,
S.D. New York.

Oct. 8, 1997.

Morrison & Foerster LLP, for Plaintiff, New York, NY, Charles L. Kerr, Carroll E. Neesemann, William E. Zuckerman, Of Counsel.

Arnold & Porter, for Defendants Pablo Madanes, Miguel Madanes, Leiser Madanes, Baltimore Ltd., Swansea Holdings, Inc., Procida Ltd. a/k/a Pegaso Ltd., and Transmarketing and Product Research Co. Panama, New York, NY, Michael D. Schissel, Tonia O. Klausner, R. Grant Brady, Of Counsel and Washington D.C., George E. Covucci, Tracey K. Friedlander, Of Counsel.

Piliero Goldstein Jenkins & Hall, LLP, for Defendants, Richard Ortoli, Rubin & Bailin, and Rubin, Kalnick, Bailin, Ortoli, Abady & Fry, P.C., New York, NY, Robert D. Piliero, Of Counsel.

## OPINION

SAND, District Judge.

Plaintiff Monica Madanes bring this action against various individual and corporate Defendants, alleging violations of RICO and asserting numerous statutory and common law claims under New York law. The Defendants move to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(2), 12(b)(6) and 9(b), as well as the doctrines of international comity, forum non conveniens and *Princess Lida.* For the reasons stated below, the Defendants' motions are granted in part and denied in part.

## BACKGROUND

A. *The Parties*

The Plaintiff Monica Madanes is an Argentine citizen and resident. The Defendants comprise two groups, individual and corporate. The individuals include Pablo Madanes, Miguel Madanes, Leiser Madanes ("Madanes Brothers"), all of whom are citi-

zens and residents of Argentina; and Richard Ortoli ("Ortoli"), a New York lawyer, along with Rubin & Bailin ("R & B") and Rubin, Kalnick, Bailin, Ortoli, Abady & Fry, P.C. ("RKB"), Ortoli's New York law firms. The corporate Defendants include Baltimore Ltd. ("Baltimore"), a corporation formed under the laws of the British Virgin Islands; Swansea Holding, Inc. ("Swansea"), a Panamanian corporation registered to do business in New York; Transmarketing and Product Research Co. Panama ("Transmarketing"), a Panamanian Corporation; and Procida Ltd., a/k/a Pegaso Ltd. ("Procida"), a corporation formed under the laws of the Isle of Man.

### B. *The History*

The history of this case spans one decade, three continents and an array of prior lawsuits. At bottom, however, is a sibling rivalry not unlike those observed with tragic frequency in the annals of law and literature. The relevant allegations are summarized below.

Manuel Madanes was a wealthy Argentine businessmen. Prior to 1986, he managed the assets of the Madanes family, including those of his four children, Monica, Pablo, Miguel and Leiser Madanes. He did so pursuant to mutual powers of attorney executed by the Madanes siblings in 1970.

Following his wife's death in 1986, Manuel apparently "became despondent and lost interest in managing the Madanes family assets." (Compl. ¶ 26.) At that point, "the Madanes Brothers began taking managerial control over the Madanes family assets and investments, including many of Ms. Madanes' assets and investments." (*Id.*) Manuel died on November 23, 1988.

The Plaintiff alleges that around the time of her father's death, the Madanes Brothers initiated a scheme to divest her of her share of the family assets. She claims that "[w]orking together with Ortoli in New York, the Madanes Brothers began implementing a scheme in early 1988 to restructure all of the Madanes family overseas assets into various companies and trusts that would ensure that the Madanes Brothers would attain dominion and control over the assets, to the exclusion of their sister, Ms. Madanes, the rightful one-quarter owner of those assets." (*Id.* ¶ 1.) The allegation is that "the Madanes Brothers controlled the [family] assets for the sole purpose of enriching themselves." (*Id.* ¶ 2.) Ortoli, the family lawyer initially hired by Manuel in 1984, is alleged to have consorted with the Madanes Brothers since the outset of this scheme.

The Complaint describes a complex web of transactions involving the family assets. It also maintains that complexity itself has been one goal of these transactions, insofar as such complexity has impeded Ms. Madanes' ability to recover her share of the family assets. (*Id.* ¶ 22.) Mindful that the Plaintiff has alleged "that there exist additional accounts and assets of which she is not specifically aware" but to which she is entitled, (*id.* ¶ 3), the Court believes that Ms. Madanes' core allegations may be grouped into six analytically distinct categories. Each is described below.

### 1. *Swansea*

Swansea Holding, Inc. ("Swansea") was incorporated in Panama in 1984. Soon thereafter the Board of Directors of Swansea granted to Ortoli a general power of attorney to act on behalf of this entity. Ms. Madanes has been a beneficiary of Swansea since its inception, and the Madanes Brothers became joint beneficiaries in 1986.

Starting in late 1985, Swansea invested $6.2 million in West Street Associates, a New York limited partnership which owned a building at 250 West Street in New York City. This building was eventually sold at a profit. Ms. Madanes alleges that in June of 1987, Miguel directed Ortoli to transmit to the Dolmy Account,[1] located in Switzerland and under the exclusive control of the Madanes Brothers, all funds paid over to Swan-

---

1. Ms. Madanes alleges on information and belief that Pablo directed the Fides Trust Company ("Fides Trust") of Zurich, Switzerland to establish Dolmy Trading Corp., S.A. ("Dolmy") for the principal purpose of owning Account Number 258896–92 ("Dolmy Account") at Credit Suisse Bank, Zurich. This purportedly has enabled the Madanes Brothers to hide the fact that funds passing through the Dolmy Account were in fact owned and controlled by them. (Compl. ¶ 93.)

sea by West Street Associates resulting from the sale of 250 West Street. (*Id.* ¶ 95.) She further alleges that Ortoli soon thereafter instructed the manager of West Street Associates to make this transfer, and that between June 1987 and December 1988, West Street Associates transferred to the Dolmy Account over $7.6 million in funds belonging to Swansea "by means of wire transfers between New York City and Zurich, Switzerland." (*Id.* ¶ 97.) This money allegedly was later transferred to a secret escrow account at Credit Suisse Zurich ("Escrow Account") and then into the Procida Account in Switzerland. (*Id.* ¶¶ 134–35.)[2] The Plaintiff claims that she has never received her rightful share of these distributions ("Swansea Distributions").

### 2. *Bingham & Tetra*

Bingham Investment Limited ("Bingham") and Tetra Investment Limited ("Tetra") were corporations formed under Bahamian law by Manuel in 1986. Each entity had related company management accounts ("Bingham and Tetra Accounts"). Upon Manuel's death, Ms. Madanes and the Madanes Brothers each owned a one-quarter beneficial interest and had signatory authority over the Bingham and Tetra Accounts. (*Id.* ¶¶ 111–12.)

The Plaintiff alleges that the Madanes Brothers made at least two fraudulent diversions with respect to these accounts. First, she contends that in November of 1988, Pablo directed Boston Trust to transfer over $1.6 million out of the Bingham Account to an account entitled Niwer, S.A., at Republic National Bank New York in New York City, which was controlled exclusively by the Madanes Brothers ("Niwer Transfer"). (*Id.* ¶ 113.)

Second, the Plaintiff alleges that following the death of Manuel, Pablo ordered the transfer of "all the funds out of the Bingham and Tetra Accounts to Account Number 541056 at Credit Suisse Zurich ('Transmarketing Account') owned by Transmarketing and in fact controlled by the Madanes Brothers." (*Id.* ¶ 114.) In fact, claims Ms. Madanes, between December 14, 1988 and January 29, 1990, a total of at least $17.2 million was transferred from the Bingham and Tetra Accounts to the Transmarketing Account. (*Id.* ¶ 116.) Like the Swansea Distributions, the funds in the Transmarketing Account were later transferred to the Escrow Account and then into the Procida Account in Switzerland.[3] The Plaintiff contends that the Madanes Brothers wrongly diverted the Transmarketing funds to their own use. (*Id.* ¶ 118.)

### 3. *New York Account*

As of December 1988, the four Madanes siblings jointly owned an account at Credit Suisse, New York ("New York Account"). The Plaintiff contends that between January 1989 and November 1992, the Madanes Brothers directed the transfer of approximately $7.5 million from the New York Account to other accounts in furtherance of their fraudulent scheme. (*Id.* ¶¶ 120–21.) She maintains that "the accounts to which some or all of the New York funds were transferred were owned or controlled exclusively by one or more of the Madanes Brothers." (*Id.* ¶ 122.)

---

**2.** Ms. Madanes also maintains that Pablo directed Fides Trust to create Procida Ltd., formed under the laws of the Isle of Man in 1993, for the purpose of owning a secret account at Credit Suisse Zurich ("Procida Account") under the control of Alice Moser. According to the Plaintiff, this would allow Pablo and Procida "to fraudulently hide the fact that funds held in and passing through the Procida Account were in fact owned and controlled by him." (Compl. ¶ 135.) Upon information and belief, Ms. Madanes further alleges that in December 1993, again at Pablo's direction, Fides Trust "formed the Cemave Trust ('Cemave'), a Guernsey trust, for the

sole purpose of holding various assets—including 100% of the shares in Procida and, in turn, the Procida Account—which would allow Pablo Madanes to hide the fact that funds and other assets held by Cemave and the entities it purportedly owned were in fact owned and controlled by Pablo Madanes." (*Id.* ¶ 137.) Finally, she asserts that although Cemave "is now the nominal owner of Procida ... in fact Pablo Madanes maintains sole and exclusive control over those assets." (*Id.* ¶ 138.)

**3.** *See supra* note 2 and accompanying text.

#### 4. *Parkhurst Trust II*

A series of British Virgin Islands Trusts was established by the Madanes Brothers in late 1988 and 1989.[4] One such set of trusts was entitled Parkhurst Trusts I–V. At the time these entities were created, Trust I pertained to Manuel, Trust II to Monica, Trust III to Miguel, Trust IV to Leiser and Trust V to Pablo. The trustee for Parkhurst Trusts I–V was Westchase Ltd. ("Westchase"), of which Ortoli was the director.

Under the Instruments of Trust, as of December 1989, Parkhurst Trusts II–V each owned a 25% interest in Lacovia, Inc. ("Lacovia"), a British Virgin Islands corporation created to hold the Madanes' family's interest in four other corporations. (*Id.* ¶¶ 42, 47.) Ortoli was the director of Lacovia. Periodically, the four companies owned by Lacovia would issue distributions of significant sums of money, which Ortoli would record in his capacity as director of both Lacovia and Westchase (the trustee of Parkhurst Trusts II–IV). The Plaintiff alleges that at the direction of the Madanes Brothers, Westchase and Ortoli "never transferred a full one-fourth of those funds to Parkhurst II and/or Ms. Madanes." (*Id.* ¶ 87.) This allegation is made upon information and belief.

#### 5. *The Artworks*

Upon the death of Manuel, each of his children inherited a one-quarter undivided interest in the Madanes family's art collection, then worth several million dollars ("Artworks"). The Plaintiff alleges that while she was traveling outside Argentina in December 1988, Pablo "removed the Artworks from the Madanes [residence] in Buenos Aires and transported them to Switzerland without Ms. Madanes' permission or knowledge." (*Id.* ¶ 63.) The art was placed in storage.

The Plaintiff alleges that in June of 1991 "the Madanes Brothers, in an effort to falsely

and fraudulently hide their ownership interest in the Artworks and as part of their overall conspiracy, undertook a scheme with Ortoli in New York to falsely represent that the Artworks had been transferred by Manuel Madanes to the Hastings Trust I prior to his death on November 23, 1988." (*Id.* ¶ 22.)[5] In furtherance of this scheme, Ms. Madanes contends, Ortoli prepared and backdated a new, false Schedule A.

In late 1992 or 1993, Ms. Madanes sought access to the Artworks in Switzerland. She was denied access, and the storage facility, purportedly at the direction of the Madanes Brothers, refused to acknowledge her rights to ownership. (*Id.* ¶ 74.) Ultimately, "Ms. Madanes was forced to bring an action in Switzerland to obtain confirmation of her ownership interests in the Artworks." (*Id.* ¶ 77.)

#### 6. *Demands for Information*

The Plaintiff maintains that the Madanes Brothers and Ortoli have stonewalled her attempts to gather information about the family assets. To start, she claims that since late 1991, the Madanes Brothers have refused to communicate with her about their management and control of her interests in such assets. (*Id.* ¶ 124.) Moreover, Ms. Madanes claims that ever since she attempted to take a more active role in administering her share of the assets in 1992, the Madanes Brothers and Ortoli have perpetrated various frauds to cover up their underlying scheme. For instance, the Plaintiff alleges that on July 8, 1992, she and her siblings entered into a written agreement pursuant to which the Madanes Brothers agreed that, within 180 days they would provide to her a full accounting of the assets and investments they were administering on her behalf. (*Id.*

---

**4.** The British Virgin Island Trusts included the Hastings Trusts I–V, Parkhurst Trusts I–V and Dobbincuff Trusts I–V. Ms. Madanes has alleged fraud in the very creation of these trusts. *See infra* note 5 and accompanying text.

**5.** The Hastings Trust I is significant because it pertains to another allegation of fraud by Ms. Madanes. Specifically, she claims that in 1988 Pablo and Ortoli executed a false signature page

to make it appear that Manuel "had authorized the creation of the Hastings Trust I and that the Instrument of Trust was duly executed before his death." (Compl. ¶ 53.) Ms. Madanes claims that this earlier fraud helped enable the Defendants to mask her ownership rights in the Artworks, thereby promoting their overall scheme to defraud her. (*Id.* ¶¶ 64–72.)

¶ 126.) According to the Plaintiff, no such information was ever disclosed.

Soon thereafter Ms. Madanes retained counsel and began an investigation into the Madanes family's assets in the United States and elsewhere. (*Id.* ¶ 129.) Although Ortoli apparently provided some information to the Plaintiff in 1993, she alleges that at the direction of the Madanes Brothers, Ortoli continued to misrepresent, *inter alia*, the facts concerning her ownership of the Artworks (*Id.* ¶¶ 130–31.) Moreover:

> On July 29, 1994, Ortoli wrote to Ms. Madanes' counsel and said that he would provide Ms. Madanes with a copy of the RKB Law Firm files relating to the Joint Representation of the Madanes Family on the condition, as required by the Madanes Brothers, that certain bank account information be used "only for the purpose of determining whether [Ms. Madanes] received her fair share of profits and distributions and enforcing her rights" and "in no way be used by [Ms. Madanes], directly or indirectly, for any purpose related to payment or nonpayment of taxes on such amounts."

(*Id.* ¶ 148.) Ms. Madanes' counsel rejected Ortoli's conditional offer. Subsequently, on August 26, 1994, four months after the Plaintiff's original request for his files, Ortoli "provided copies of what he represented to be the files." (*Id.* ¶ 150.) Finally, the Plaintiff alleges that Ortoli and the Madanes Brothers have steadfastly refused to provide an accounting of the British Virgin Island Trusts, despite an order issued by the High Court of the British Virgin Islands to provide such an accounting. (*Id.* ¶¶ 152–60.)

### C. *The Swiss Action*

On July 25, 1996, the Plaintiff filed a petition for attachment against the Madanes Brothers in the District Court in Zurich, Switzerland. (Baumgartner Decl. ¶ 3.) This order sought to attach their property in Switzerland. On July 8, 1996, the Zurich Court issued an order directing the attachment of Pablo's share of the Artworks and certain Swiss bank accounts. The Swiss Court denied the petition with respect to Miguel and Leiser. (*Id.* ¶ 5.)

As a prudential measure to perfect this attachment, Ms. Madanes claims, on August 19, 1996, she filed suit solely against Pablo in Zurich District Court. The suit is based on a contractual claim under Argentine law regarding the abuse of the power of attorney under which Ms. Madanes' assets have been managed. It seeks money damages up to the amount available pursuant to the attachment order. (*Id.* ¶¶ 11–12.)

### D. *The Instant Action*

On August 22, 1996, the Plaintiff filed this action. The Complaint alleges violations of RICO §§ 1962(c) and (d), in addition to articulating claims of fraud, conversion and breach of fiduciary duties under New York law. The RICO claims provide the sole basis for federal jurisdiction.

After serving the Complaint, Ms. Madanes served requests for third-party discovery. The Defendants moved to stay discovery pending resolution of their motions to dismiss. The Court granted the stay, subject to a telephone deposition of Leiser on the limited issue of personal jurisdiction.

### DISCUSSION

### A. *Subject Matter Jurisdiction*

Where, as here, the defendants move for dismissal pursuant to Rule 12(b)(1) as well as on other grounds, it is appropriate to consider the Rule 12(b)(1) challenge first since the accompanying defenses and objections may become moot should the Court find that subject matter jurisdiction is lacking. *Rhulen Agency v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir.1990). The uncontroverted factual allegations in the Complaint are taken as true, and the Court "may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992).

The RICO Act is silent regarding its extraterritorial application. Accordingly, "[w]hen, as here, a court is confronted with

transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts ... to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

■ "[S]pecifying the test for the extraterritorial application of RICO is delicate work.... that has not been done" in this Circuit. *North South Finance Corp. v. Al-Turki*, 100 F.3d 1046, 1052 (2d Cir.1996). District courts may seek guidance, however, from "precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters." *Id.* at 1051. After reviewing the relevant authorities, the Court concludes that RICO subject matter jurisdiction may be established by meeting either of two alternative tests: the "conduct test" or the "effects test." *See id.* at 1052 (noting that *Alfadda v. Fenn*, 935 F.2d 475 (2d Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991), "lends some support to that view").[6]

Under the conduct test, the court has subject matter jurisdiction "where conduct material to the completion of the fraud occurred in the United States." *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 (2d Cir.

1983). According to the *Psimenos* Court, "[m]ere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." Instead, "[o]nly where conduct 'within the United States directly caused' the loss will a district court have jurisdiction...." *Id.* at 1051 (quoting *Bersch*, 519 F.2d at 993). Under the alternative effects test, the court has jurisdiction "whenever a predominantly foreign transaction has substantial effects within the United States." *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir.1989). Accordingly, remote or indirect effects in the United States do not confer subject matter jurisdiction. *Id.*

■ The Court finds that the Plaintiff's allegations satisfy the conduct test for subject matter jurisdiction.[7] Relevant allegations include, *inter alia*, the fraudulent transfers pertaining to Swansea and the Niwer Account, and the numerous acts of mail and wire fraud designed to mask the Defendants' malfeasance and otherwise further the goals of the alleged enterprise.

Of primary importance to this inquiry are Ms. Madanes' detailed allegations concerning the fraudulent diversion of her quarter share of the Swansea Distributions (Compl. ¶¶ 92–101, 105–07). Specifically, the Plaintiff contends that Miguel, via telefax from Argentina on June 19, 1987, directed Ortoli to transmit

---

**6.** In cases concerning transnational securities frauds, the Second Circuit focuses on alternative tests—the abovementioned "conduct test" and "effects test"—and finds subject matter jurisdiction whenever either of the tests is met. *See Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 121–22 (2d Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 703, — L.Ed.2d — (1996). The rationale for focusing on conduct occurring in the United States is that "Congress did not want 'to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'" *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir.1983) (quoting *IIT v. Vencap Ltd.*, 519 F.2d 1001, 1017 (2d Cir.1975)). This rationale is also applicable to the exportation of racketeering activity. *See, e.g.,* Kristen Neller, Note, *Extraterritorial Application of RICO: Protecting U.S. Markets in a Global Economy*, 14 Mich. J. Int'l L. 357, 382 (1993) (analyzing legislative history of RICO and focusing on "effects test" yet noting need to prevent foreign entities from "flock[ing] to the United States to

engage in organized crime and escape punishment").

The reasoning behind application of the "effects test" is equally compelling: to protect domestic investors and markets from corrupt foreign influences. This is true in the context of both securities and antitrust fraud, *see Al-Turki*, 100 F.3d at 1050–51, and such analysis is applicable to RICO as well. *See* Neller, 14 Mich. J. Int'l L. at 382. Accordingly, the most judicious approach is to permit RICO subject matter jurisdiction where either test is met, as other Circuits have done. *See, e.g., Butte Mining PLC v. Smith*, 76 F.3d 287, 292 (9th Cir.1996) (distinguishing *Republic of Philippines v. Marcos*, 862 F.2d 1355 (9th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989), as case in which plaintiff's allegations satisfied both "conduct" and "effects" tests).

**7.** In light of this finding, the Court refrains from determining whether the Plaintiff has satisfied the "effects test" for subject matter jurisdiction.

to the Dolmy Account all funds paid over to Swansea in connection with the sale of 250 West Street. (*Id.* ¶ 95.) The Plaintiff contends that Ortoli arranged for this transfer, and that between June 1987 and December 1988 over $7.6 million was transferred to the Dolmy Account by means of wire transfers between New York City and Zurich, Switzerland. (*Id.* ¶¶ 96–97.)

The Defendants rely on *North South Finance Corp. v. Al–Turki*, 100 F.3d 1046 (2d Cir.1996), to argue that the alleged conduct pertaining to Swansea fails to confer subject matter jurisdiction. Such reliance is misplaced. The key distinction is the precise nature of the frauds involved in these two cases. In *Al–Turki*, the transfer of funds from New York to Paris was merely incidental to the principal fraud, which was perpetrated overseas and consisted of the artificial depression of the sale price of a French bank through the corruption of the bank's general manager in Paris. *See id.* at 1048, 1053 (finding that "[t]he transfer of repayments from New York to Paris did not prevent plaintiffs from getting their purchase price"). The case of *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir.1996), is similarly distinguishable. *See id.* at 291–92 (denying RICO subject matter jurisdiction where fraudulent stock swap was "committed by foreign individuals on a foreign corporation in a foreign country" and American lawyer was "not alleged to have engaged in or aided the fraudulent exchange of any stock").

In contrast, the explicit allegation here is that the Swansea transfer *itself* is the fraud, insofar as it served to hide the Madanes family's assets from the Plaintiff. Given that Ms. Madanes "has never been a signatory on the Dolmy Account, and has never had a right of access to the funds held in the Dolmy Account," (Compl. ¶ 94), it is clear that "[t]his wire transfer was not merely a preparatory act, but rather was an integral part of the alleged conversion." *Thai Airways Int'l Ltd. v. United Aviation Leasing B. V.*, 842 F.Supp. 1567, 1571 (S.D.N.Y.1994) (finding RICO subject matter jurisdiction in suit between foreign parties where, *inter alia*, fraudulent wire transfer of security deposits from New York bank account to Swiss bank account resulted in commingling of funds). In addition, the Plaintiff contends that Ortoli, a New York attorney, played an integral role in this specific act of fraud. In short, these allegations create a meaningful nexus to New York. *Id.*

Moreover, Ms. Madanes contends that the fraudulent transfer of approximately $1.6 million from the Bingham Account in the Bahamas to the Niwer Account in New York was part of the overall conspiracy to defraud her of her rightful share of the family assets. Just as with Swansea, the Niwer transfer also involved the movement of assets from an account that was jointly owned by the Plaintiff to an account that was controlled exclusively by the Madanes Brothers. (Compl. ¶ 113.) These allegations support a finding of subject matter jurisdiction. *See, e.g., Republic of Philippines v. Marcos*, 862 F.2d 1355, 1358 (9th Cir.1988) (en banc) (finding RICO subject matter jurisdiction in suit by foreign country against former president and wife where defendants allegedly transferred stolen assets to United States), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989); *Bank of Crete, S.A. v. Koskotas*, No. 88 CIV. 8412, 1991 WL 177287 at *6 (S.D.N.Y. Aug.30, 1991)(illicit transfers to defendant's personal accounts in New York served as predicate acts justifying RICO subject matter jurisdiction).

Accordingly, Ms. Madanes' allegations regarding Swansea and Niwer, when coupled with her claim that the attendant communications among the Defendants constituted predicate acts of mail and wire fraud, demonstrate for the limited purposes of this motion that conduct material to the completion of fraud occurred in the United States. *Thai Airways*, 842 F.Supp. at 1571; *see Alfadda v. Fenn*, 935 F.2d 475, 480 (2d Cir.) (holding that predicate acts of securities fraud which occurred primarily in United States served as sufficient basis for RICO subject matter jurisdiction in suit between predominantly foreign parties), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991); *cf. C.A. Westel v. AT & T*, No. 90 CIV. 6665, 1992 WL 209641 (S.D.N.Y. Aug.17, 1992), at *16 (finding RICO subject matter jurisdiction in suit by foreign corporation against Ameri-

can defendant where numerous predicate acts of mail and wire fraud occurred in United States).[8] Thus, the Court has subject matter jurisdiction over any properly pleaded RICO claims.

## B. *RICO § 1962(c)*

On a 12(b)(6) motion to dismiss, the Court must consider the facts in the light most favorable to the plaintiff, and dismissal is appropriate only where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). This consideration is confined to the facts "stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken." *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994).

■ In her first cause of action, the Plaintiff alleges that the Defendants violated § 1962(c) of the RICO Act. This section prohibits conducting the affairs of an enterprise through a *pattern of racketeering activity*. To establish the threshold pleading requirements under § 1962(c), the plaintiff must allege the following: (1) that the defendants (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invest in, or maintain an interest in, or participate in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). These elements are addressed in turn.

### 1. *Enterprise*

The Defendants argue that dismissal of the § 1962(c) claim is appropriate because the Plaintiff has failed to plead the existence of an "enterprise." The Court disagrees.

■ The RICO Act defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Such an enterprise may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Moreover, the existence of an "association-in-fact" may be established through proof of various racketeering acts. However, the plaintiff must show that such an enterprise is "separate and apart from the pattern of activity in which it engages." *Id.* The Second Circuit has adopted an expansive reading of the enterprise element. *See United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.1989) (en banc).

■ Ms. Madanes' pleadings meet the *Turkette* standard. She alleges the existence of an association-in-fact, consisting of all the Defendants, formed nearly a decade ago "for the common and continuing purpose of implementing their scheme to defraud Ms. Madanes." (Compl. ¶ 163.) The structure of this enterprise is clear from the pleadings: the Madanes Brothers have been the primary architects and beneficiaries; Ortoli and the other New York lawyers have performed the legal work; and the Defendant corporations, such as Transmarketing and Procida, have played specific roles in the relocation of assets to Switzerland. Accordingly, the Plaintiff has identified "a core group of personnel which len[d] the enterprise the continuity and unity of purpose indicative of a RICO 'enterprise.'" *131 Main St. Assoc. v. Manko*, 897 F.Supp. 1507, 1527 (S.D.N.Y. 1995). At this stage, nothing more is required. *See, e.g., Trustees of Plumbers Nat'l Pension Fund v. Transworld Mechanical, Inc.*, 886 F.Supp. 1134, 1144–45 (S.D.N.Y. 1995) (noting that pleading of RICO enter-

---

**8.** We note that the *C.A. Westel* Court rejected the use of the conduct and effects tests in favor of a test that asked whether the alleged predicate acts occurred primarily or exclusively in the United States. *C.A. Westel*, 1992 WL 209641, at *16. Even assuming *arguendo* that this formulation is appropriate, we find that the predicate acts alleged by Ms. Madanes satisfy this standard.

prise need only meet requirements of Rule 8); *Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F.Supp. 213, 234–35 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir.1995); *see also Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F.Supp. 1224, 1235–36 (E.D.N.Y. 1996).

### 2. *Predicate Acts*

■ The Plaintiff alleges that the Defendants have committed predicate acts of mail fraud, wire fraud and money laundering. Predicate acts of mail and wire fraud must be alleged with the particularity required by Rule 9(b). *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Accordingly, the plaintiff must "allege and provide specific factual evidence of the content, time, place, and speaker of each alleged mailing or wire transmission." *Living Music Records, Inc. v. Moss Music Group, Inc.*, 827 F.Supp. 974, 981 (S.D.N.Y. 1993). The plaintiff "must also demonstrate how each purported mailing or wire transmission furthered the alleged fraudulent scheme." *Id.* The heightened pleading requirements of Rule 9(b), however, apply only to claims sounding in fraud or mistake. *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir.1992). Accordingly, the money laundering allegations are assessed under the less stringent "notice pleading" requirements of Rule 8(a). *Ray v. General Motors Acceptance Corp.*, No. 92 CIV. 5043, 1995 WL 151852, at *5 (E.D.N.Y. Mar.28, 1995); *Mer-*

*rill Lynch v. Young*, No. 91 CIV. 2923, 1994 WL 88129 (S.D.N.Y. Mar.15, 1994), at *7.

■ The Defendants contend that the Complaint should be dismissed because various allegations are insufficiently particular under Rule 9(b), improperly plead on information and belief,[9] or otherwise inappropriate. In certain respects, the Court agrees.[10] The flaw in this argument, however, is that the plaintiff does not have the burden of perfection, and thus a complaint may survive despite its blemishes. *See, e.g., Spira v. Nick*, 876 F.Supp. 553, 559 (S.D.N.Y.1995) (finding that although numerous allegations failed to meet the requirements of Rule 9(b), they were "not essential to the sufficiency of the complaint"). Such is the case here.

The following is a representative sample of adequate allegations:

- "By telefax dated June 19, 1987, sent by wire from Argentina to New York City, Miguel Madanes directed Ortoli to transmit to the Dolmy Account all funds paid over to Swansea in New York by West Street Associates in connection with the sale of 250 West Street." (Compl. ¶ 95.)
- "On information and belief, between June 1987 and December 1988, West Street Associates transferred to the Dolmy Account $7,614,776.08 in funds belonging to Swansea by means of wire transfers between New York City and Zurich, Switzerland." (*Id.* ¶ 97.)

9. It is well established that a plaintiff may base allegations on information and belief when facts are peculiarly within the opposing party's knowledge. *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). Such is the case where, as here, the defendants are alleged to have manipulated the relevant events. *See Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F.Supp. 1033, 1040 (S.D.N.Y.1993) ("In the case where manipulation is alleged, as opposed to affirmative misrepresentation, some or all of the facts will be in the control of the defendants and inaccessible to the plaintiffs without discovery.") Accordingly, Ms. Madanes must be allowed some information and belief pleading. *See id.* Indeed, the Court notes that the majority of the significant allegations are not based on information and belief, and thus some leeway is not inappropriate.

It is equally clear, however, that this "exception to Rule 9(b)'s general requirement of partic-

ularized pleading does not constitute a license to base claims of fraud on speculation or conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy a relaxed pleading standard." *Merrill Lynch*, 1994 WL 88129, at *7. As the accompanying discussion indicates, such specific facts are evident here.

10. For instance, the Plaintiff maintains that her numerous requests for information and an accounting constitute acts of mail fraud attributable to the Defendants, whose scheme supposedly "caused" such mailings. The Court rejects this argument on the basis that such letters were not in furtherance of the Defendant's purported scheme. *See, e.g., Thai Airways*, 842 F.Supp. at 1571 (holding that letters sent by plaintiff to defendant which merely demanded return of allegedly stolen security deposit do not fall within mail fraud statute).

- "On or about November 17, 1988, Pablo Madanes directed Boston Trust to transfer $1,685,000 out of the Bingham Account to an account entitled Niwer, S.A., at Republic National Bank New York in New York City, which was controlled by the Madanes Brothers." (*Id.* ¶ 113.)
- "Between January 1989 and November 1992, the Madanes Brothers directed Credit Suisse (New York), by means of the wires and mail, to transfer approximately $7.5 million (the 'New York Funds') from the New York Account to other accounts." Further, "[u]pon information and belief, the accounts to which some or all of the New York Funds were transferred were owned or controlled exclusively by one or more of the Madanes Brothers." (*Id.* ¶¶ 120, 122.)
- "On January 12, 1989, Ortoli sent to Pablo Madanes new and revised versions of the Instruments of Trust for the British Virgin Islands Trusts. The Instruments of Trust for the Hastings Trusts I–V contained signature lines stating that 'this deed has been duly executed on the date first written' which is stated to be November 21, 1988. Both Ortoli and Pablo Madanes executed the Instruments of Trust for the Hastings Trusts I–V in January 1989 and did not in fact execute the Instruments of Trust on November 21, 1988." (*Id.* ¶ 56.)
- "On June 18, 1991, the Madanes Brothers, through their Argentine counsel, sent a telefax to Ortoli in New York, requesting that Ortoli assist them in their scheme to falsify the ownership of the Artworks." (*Id.* ¶ 67.)
- "By telefax sent on June 21, 1991, Ortoli agreed to assist the Madanes Brothers in the scheme [regarding the Artworks] and suggested that it could be accomplished simply by preparing a new Schedule A...." (*Id.* ¶ 68.)
- "By telefax sent on September 9, 1991 to Ortoli in New York, the Madanes Brothers, through their [Argentine] counsel, sent to Ortoli descriptions of the Artworks and requested that he prepare a new Schedule A that falsely stated that the Artworks had been transferred to the Has-

tings Trust I by Manuel Madanes before his death." (*Id.* ¶ 69.)
- "In a letter to HWR Trustees Limited dated October 28, 1995, Ortoli stated falsely and fraudulently · represented that he had resigned as Director of Baltimore and Westchase pursuant to a letter dated January 17, 1990 (the 'Alleged Resignation.') In fact, in his capacity as Director of Westchase in July of 1990, Ortoli prepared and executed on behalf of Westchase receipts of funds from Lacovia dated April 18, 1990 and November 9, 1990." (*Id.* ¶ 157.)

The foregoing acts are all alleged to have been in furtherance of the scheme to defraud Ms. Madanes, and thus may qualify as predicate acts for purposes of § 1962(c). Moreover, the Complaint identifies the specific roles played by each Defendant, including, for instance, allegations that Miguel directed Ortoli regarding Swansea, Pablo set up Dolmy and Procida, and Leiser participated in the scheme to defraud Ms. Madanes and caused the transmittal of wires and letters in furtherance of such scheme. The specific roles played by each corporate Defendant are also adequately delineated; for example, Transmarketing is alleged to have been a conduit to move funds from Bingham and Tetra to Procida. To borrow from a recent case:

> Here, the circumstances constituting the fraud—the relationships giving rise to the fiduciary duties owed by [the defendants], the details of the alleged embezzlement, and the concealment—generally are stated with particularity. The complaint alleges, among other things, specific diversions of funds, giving in most cases the *approximate* dates, amounts and purposes. Thus, Rule 9(b) is satisfied as to the core of the complaint. . . .

*Spira,* 876 F.Supp. at 559 (emphasis added); *see, e.g., Beth Israel Med. Ctr. v. Smith,* 576 F.Supp. 1061, 1070–71 (S.D.N.Y.1983) (holding that failure to identify specific dates and contents of mailings was not fatal to complaint where complaint offered detailed description of defendants' overall RICO scheme); *cf. Carr v. Equistar Offshore, Ltd.,* No. 94 CIV. 5567, 1995 WL 562178, at *11 (S.D.N.Y. Sept.21, 1995) (Rule 9(b) satis-

fied in securities suit where plaintiff set forth misstatements made over telephone, by fax and in person).

### 3. *Pattern of Racketeering Activity*

The Defendants next argue that dismissal of the § 1962(c) claim is appropriate because the Plaintiff has failed to demonstrate the existence of a pattern of racketeering activity. The Court rejects this contention.

■ To allege adequately a pattern of racketeering activity, the plaintiff must demonstrate that the defendants committed two or more predicate acts within a ten year period. 18 U.S.C. § 1961(4). Moreover, the plaintiff must show that the racketeering predicates are both related and continuous. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989). As one court summarized recently:

> The relatedness requirement is the easier of the two to define: predicate acts are related if they share similar purposes, participants, victims, methods or other distinguishing characteristics; in short, they must not be isolated or sporadic. Continuity, however, is a more fluid concept: it can be either open- or close-ended in nature, *i.e.*, continuity can be shown either through a series of related predicate acts extending over a substantial period of time or by past conduct which by its nature extends into the future.

*Transworld Mechanical*, 886 F.Supp. at 1144 (citations omitted).

■ The Plaintiff has adequately alleged the existence of a pattern of racketeering activity. To start, the Plaintiff has met the requirement of relatedness. Throughout her Complaint, Ms. Madanes has consistently alleged that the enterprise had one victim, herself, and that it existed for the sole purpose of defrauding her of her rightful share of the Madanes family's assets. (Compl. ¶ 163.) In addition, as was explained in Section B(1), *supra*, the Plaintiff has identified a core group of actors responsible for masterminding and perpetrating this scheme. Moreover, according to the Plaintiff, the Defendants' methodology has been remarkably uniform. Specifically, regardless of whether the assets at stake were artwork or cash, the Defendants, through a series of complex transactions, have succeeded in moving such assets from trusts and accounts in which the Plaintiff had the right of access, to trusts and accounts in which she did not. Thus, all of the alleged predicates of mail fraud, wire fraud and money laundering are related insofar as they served either to execute the fraud, or mask it. *See, e.g., Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir.1989) (although plaintiff alleged separate acts involving separate properties, relatedness present where all acts had purported effect of depriving plaintiff of his interest in real estate entity). At this stage, nothing more is required. *See, e.g., Koal Indus. v. Asland, S.A.*, 808 F.Supp. 1143, 1161–62 (S.D.N.Y. 1992) (holding that plaintiff stated pattern of racketeering activity where defendants allegedly committed various predicates with common design of defrauding plaintiffs of money and obtaining control of coal mine).

■ The Plaintiff has also met the continuity requirement. Specifically, the Court finds that Ms. Madanes had adequately alleged the existence of a closed-ended pattern of racketeering activity.[11] Of particular relevance is the allegation that the Defendants' scheme, beginning with the initial fraudulent transfers in 1987 and continuing through the Defendant's repeated refusals to cooperate, has lasted for over a decade. (Compl. ¶¶ 97, 157.) This time frame clearly satisfies the Supreme Court's mandate that the alleged predicate acts must have occurred over "a substantial period of time." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2908; *see, e.g., Jacobson*, 882 F.2d at 720 (finding closed-ended continuity where predicate acts occurred over period of approximately eight years); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir.1992) (finding closed-ended continuity where predicate acts covered peri-

---

11. In light of this ruling, the court refrains from determining the issue of whether the Plaintiff has also stated an open-ended pattern of continuity. *See GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir.1995) (noting disjunctive nature of requirement), *cert. denied,* —— U.S. ——, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996).

od of nearly two years), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). Moreover, the allegation that, despite different points of origin and conduits of travel, both the Swansea Distributions and the Bingham and Tetra funds ended up in the Procida Account, belies any claim that the foregoing transactions were not part of a continuous and related scheme. *See, e.g., Transworld Mechanical,* 886 F.Supp. at 1144 (allegation that defendants set up series of "sham corporations" to defraud plaintiffs supported finding of continuity). Accordingly, the Defendants' motion to dismiss on this ground is denied.

### 4. *Participation*

#### a. *The Lawyers*

Ortoli contends that the § 1962(c) claim against him, R & B, and RKB should be dismissed on the basis of *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), and its progeny. The Court agrees.

At issue in *Reves* was, as here, the liability of outside professionals rendering services to an alleged RICO enterprise. *Id.* at 176–77, 113 S.Ct. at 1168–69. *Reves* established that to be liable under § 1962(c), "one must participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. at 1173. The Supreme Court emphasized that although RICO liability "is not limited to those with a formal position in the enterprise ... *some* part in directing the enterprise's affairs is required." *Id.* at 179, 113 S.Ct. at 1170. The post-*Reves* cases discussing this issue are legion. *See, e.g., Department of Econ, Dev. v. Arthur Andersen & Co.,* 924 F.Supp. 449, 466 (S.D.N.Y.1996) (providing exhaustive summary of case law).

█ At the outset, the Plaintiff's articulation of the goal of the alleged enterprise is instructive. The Complaint clearly alleges that this has been "to restructure all of the Madanes family overseas assets into various companies and trusts that would ensure that the Madanes Brothers would attain dominion and control over the assets, to the exclusion of their sister, Ms. Madanes, the rightful one-quarter owner of those assets." (Compl. ¶ 1.) It further contends that "the Madanes Brothers controlled the [family] assets for the sole purpose of enriching themselves." (*Id.* ¶ 2.) The Complaint does not allege, however, that Ortoli, or any other lawyer, profited other than through the receipt of ordinary fees for their professional services. The Court considers this significant, though certainly not dispositive. *See, e.g., Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants,* 832 F.Supp. 585, 591 (E.D.N.Y.1993).

Of greater consequence is the examination of Ortoli's purported role in the enterprise.[12] The Complaint itself states that "all acts of Ortoli alleged herein after October of 1986 were done in the course of, or were within the scope of, his employment by and/or his membership in the RKB Law Firm." (Compl. ¶ 33.) This statement, along with the description of Ortoli's actions contained in the Complaint, shows that Ortoli fits the description of an "outsider" providing professional services to the alleged RICO enterprise. *See, e.g., Reves,* 507 U.S. at 172–75, 113 S.Ct. at 1166–68 (describing facts of case). The services provided by Ortoli include offering advice on estate and tax planning, drafting documents, establishing trusts and corporations, and acting as a director and attorney-in-fact for some of those entities. (Compl. ¶¶ 31, 35, 37, 45–47, 50.)

The aforesaid activities constitute the provision of standard legal services. *See, e.g., Biofeedtrac,* 832 F.Supp. at 587–89 (finding that corporate counsel customarily fill roles such as director and corporate secretary). Accordingly, Ortoli is not liable under § 1962(c) for providing such services to the Madanes Brothers. *See, e.g., Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521–22 (2d Cir.1994) (provision of legal services in context of fraudulent real estate transaction does not establish RICO liability); *Morin v.*

---

**12.** Recall that Ortoli first began working for the Madanes family in 1984, when he was contacted by Manuel regarding an investment opportunity. (Compl. ¶ 31.) The Complaint also explains that "[b]eginning in or about March 1988 and continuing thereafter, Ortoli and the RKB Law Firm, at the request of and under the direction of Pablo Madanes, began advising the Madanes family, through the Madanes Brothers, in connection with estate and tax planning." (*Id.* ¶ 35.)

*Trupin*, 835 F.Supp. 126, 135 (S.D.N.Y.1993). Simply put, "providing important services to a racketeering enterprise is not the same as directing the affairs of an enterprise." *Arthur Andersen*, 924 F.Supp. at 466 (S.D.N.Y. 1996). This is true even when the provision of services is "essential to the operation of the RICO enterprise itself." *De Wit v. Firstar Corp.*, 879 F.Supp. 947, 966 (N.D.Iowa 1995).

The Plaintiff alleges, however, that beyond merely providing legal services, Ortoli was substantially involved in the affairs of the enterprise.[13] But even this fails to establish liability under § 1962(c). *See, e.g., Biofeedtrac*, 832 F.Supp. at 587–89 (no liability even though RICO enterprise was attorney's sole client and attorney incorporated two corporate defendants involved in scheme and then served as director and officer for both corporations); *see also Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F.Supp. 248, 254–55 (S.D.N.Y.1997) (collecting cases). Nor do allegations that Ortoli knowingly concealed the fraudulent activities of the enterprise change this result. *See, e.g., Baumer v. Pachl*, 8 F.3d 1341, 1342–44 (9th Cir.1993) (no liability where attorney prepared letters to state officials "to forestall and cover-up the fraud by minimizing or mischaracterizing the [enterprise's] allegedly improper activities"). Indeed, even claims that Ortoli recommended certain courses of fraudulent behavior, or that he had "substantial persuasive power to induce management to take certain actions," are insufficient to establish § 1962(c) liability. *Strong & Fisher Ltd. v. Maxima Leather, Inc.*, No. 91 CIV. 1799, 1993 WL 277205, at *1 (S.D.N.Y. July 22, 1993); *see also Arthur Andersen*, 924 F.Supp. at 467. Accordingly, the Court dismisses the § 1962(c) claim against Ortoli, R & B and RKB.[14]

### b. *Baltimore*

Baltimore advances a claim analogous to Ortoli's, relying on *Reves* to argue that it did not participate in the operation or management of the alleged enterprise. The Court agrees.

Baltimore was incorporated in 1988 to serve as the trustee for the Hastings Trusts I–V. (Compl. ¶ 50.) Ortoli apparently has been its sole director. (*Id.* ¶ 17.) The factual predicates for Ms. Madanes' claim that Baltimore directed the enterprise are essentially three. First, she cites Baltimore's involvement in covering up her rightful ownership of the Artworks. (*Id.* ¶¶ 66, 68, 72.) Second, she cites Baltimore's repeated refusal to respond to requests for information (*Id.* ¶ 78.) And third, she identifies Baltimore's refusal to provide an accounting. (*Id.* ¶¶ 152, 154.)

**13.** The factual support for this allegation is questionable in light of the fact that the Madanes Brothers took many large steps in the scheme without Ortoli's involvement. For instance, Pablo transferred the Artworks to Switzerland in 1988, apparently without the assistance of Ortoli or his firm, and it was not until several years later, in 1991, that the Madanes Brothers allegedly sought Ortoli's help in preparing a false schedule to prevent Ms. Madanes from gaining access to the collection. (Compl. ¶¶ 63, 67.) Moreover, the transfer of funds from the Bingham and Tetra Accounts—involving vast sums of money equaling $1,685,000 and $17,211,000—were apparently undertaken without the aid of Ortoli or his firm, who are not mentioned in this portion of the Complaint. (*Id.* ¶¶ 108–23.) Perhaps most significantly, the efforts of the Madanes Brothers to conceal assets in Switzerland through the creation of the secret Escrow Account and the Cemave Trust were also undertaken without Ortoli's involvement; again, he is not mentioned in this part of the Complaint. (*Id.* ¶¶ 133–37.)

**14.** The post-*Reves* cases upholding claims against professionals are distinguishable. For instance, in many of these cases the core fraud was a scheme to file false lawsuits. *See, e.g., Napoli v. United States*, 32 F.3d 31, 33 (2d Cir. 1994) (scheme involved pattern of mail fraud and witness bribery by pursuing counterfeit claims and using false witnesses in personal injury trials and law firm defendant "earned millions in contingency fees from personal injury suits involving fraud or bribery"), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *Tribune Co. v. Purcigliotti*, 869 F.Supp. 1076, 1082–83 (S.D.N.Y.1994) (scheme resulted in filing of hundreds of fraudulent workers' compensation hearing loss claims), *aff'd sub nom. Tribune Co. v. Abiola*, 66 F.3d 12 (2d Cir.1995); *Shuttlesworth v. Housing Opportunities*, 873 F.Supp. 1069, 1075–76 (S.D.Ohio 1994) (defendant lawyers allegedly solicited female tenants to bring false sexual harassment claims and lawsuits against plaintiff landlord). Obviously, a lawyer who solicits and files false lawsuits plays a key role in directing this type of RICO scheme.

The foregoing allegations are insufficient to establish Baltimore's liability under § 1962(c). Ms. Madanes merely points to evidence which, if true, demonstrates that Baltimore has helped cover up the scheme directed by the Madanes Brothers. Indeed, the Complaint itself alleges that "at all times relevant hereto, [Baltimore] has been under the control of the Madanes Brothers." (*Id.* ¶ 17.) In addition, the Complaint states that it was the Madanes Brothers who "request[ed] that Ortoli assist them in their scheme to falsify the ownership of the Artworks." (Compl. ¶ 67.) Accordingly, the requisite element of management is missing. *See, e.g., Baumer,* 8 F.3d at 1342–44 (merely forestalling discovery of fraud insufficient for § 1962(c) liability); *Amalgamated Bank v. Marsh,* 823 F.Supp. 209, 220–21 (S.D.N.Y. 1993) (mere acceptance of fraudulent proceeds insufficient to show "operation or management").

In summary, the § 1962(c) claim is dismissed with respect to Ortoli, R & B, RKB and Baltimore, but maintained as against the remaining Defendants.

### C. *RICO § 1962(d)*

The Defendants also argue that the Plaintiff has failed to state a claim under RICO § 1962(d). This contention is without merit.

■ Section 1962(d) prohibits conspiring to violate either § 1962(a), (b) or (c). "When read in conjunction with the language of § 1962(c), RICO's conspiracy provision proscribes an agreement 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *United States v. Viola,* 35 F.3d 37, 43 (2d Cir.1994) (citation omitted), *cert. denied,* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). Accordingly, the RICO conspiracy charge "is proven if the defendant 'embraced the objective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance thereof." *Id.* (citation omitted).

Leaving aside for the moment the § 1962(d) liability of Ortoli [15] and Baltimore, there is no question that the Complaint states a § 1962(d) claim against the remaining Defendants. Indeed, the principal argument advanced by the Defendants—that the RICO conspiracy claim must fail because the underlying substantive claim is deficient—obviously flawed in light of the Court's sustaining the Plaintiff's § 1962(c) claim against all of the Defendants except Ortoli, R & B, RKB and Baltimore. Moreover, our prior analysis makes clear that the Complaint provides a substantial factual basis from which to infer an agreement among these Defendants. *E.g., Spira,* 876 F.Supp. at 560–61 (requirement of agreement to commit at least two acts of racketeering activity satisfied by conscious adherence to fraudulent scheme pursuant to which two mailings in furtherance of scheme were foreseeable); *see also Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990) (noting that Rule 9(b) applies only to fraud or mistake, not conspiracy, and thus pleading of conspiracy, apart from underlying acts of fraud, is properly measured under more liberal pleading requirements of Rule 8(a)).

■ With respect to Ortoli and Baltimore, the question is whether someone can be guilty of a RICO conspiracy even if he cannot be characterized as an operator or manager of a RICO enterprise under *Reves.* In the Second Circuit, the answer is yes. *See Viola,* 35 F.3d at 43 ("A defendant can be guilty of conspiring to violate a law, even if he is not among the class of persons who could commit the crime directly."); *see also MCM Partners, Inc. v. Andrews–Bartlett & Assocs.,* 62 F.3d 967, 980 (7th Cir.1995); *United States v. Starrett,* 55 F.3d 1525, 1547–48 (11th Cir.1995); *United States v. Quintanilla,* 2 F.3d 1469, 1484–85 (7th Cir.1993). *But see United States v. Antar,* 53 F.3d 568, 580–82 (3d Cir.1995) (stating that while conspiring to operate or manage an enterprise establishes 1962(d) violation, conspiring with

---

**15.** For purposes of liability under § 1962(d), the fates of R & B and RKB depend on that of their agent Ortoli.

someone who is an operator or manager of enterprise does not).[16]

In *Viola*, the defendant's § 1962(c) conviction was overturned in the wake of *Reves'* because the defendant was merely a "janitor and handyman" for the enterprise's actual operators and managers. *Id.* at 43. The court found, however, that reversal of the defendant's substantive RICO conviction on grounds that he did not participate in the operation or management of the enterprise did not require automatic reversal of his § 1962(d) conviction. Thus, the court proceeded to inquire as to whether the defendant was a co-conspirator under § 1962(d) on the basis of his two criminal acts of transporting stolen beer and lamps. *Id.* (noting that defendant's acts were undertaken "without the exercise of appreciable discretionary authority"). It wrote:

> In this case, there was a conspiracy to conduct the Viola enterprise's affairs through a pattern of racketeering activity, and [the defendant] committed two crimes that qualify as RICO predicate acts. The narrow issue thus presented is whether the government produced sufficient evidence to convince a jury beyond a reasonable doubt that [the defendant] knowingly associated with the Viola enterprise by agreeing to commit the predicate acts.

*Id.* at 43–44 (characterizing defendant's acts as discrete stolen property crimes and finding no conspiratorial liability where record was devoid of evidence that defendant knew he was part of larger enterprise).

■ Assuming that the allegations in the Complaint are true, Ortoli has committed at least two crimes that qualify as RICO predicate acts. For instance, according to Ms. Madanes, Ortoli committed mail fraud when he sent to Pablo Madanes fraudulent paperwork concerning the Instruments of Trust for Hastings Trusts I–V, the creation of which helped establish the framework to defraud Ms. Madanes (Compl. ¶ 56.) The Plaintiff also alleges that Ortoli committed wire fraud when he sent a telefax to the Madanes Brothers stating that he would assist them in their scheme to falsify the ownership of the Artworks for the purpose of defrauding Ms. Madanes of her ownership rights therein.

■ Thus, the issue for the Court is whether Ortoli knowingly associated with the "enterprise" by agreeing to commit these predicate acts. To demonstrate a RICO conspirator's knowledge of the RICO conspiracy, it is sufficient to show that "the defendant know[s] the general nature of the enterprise and know[s] that the enterprise extends beyond his general role." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.), *cert. denied*, 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). Moreover, "it is axiomatic that the proof required to show that a defendant knowingly associated with an existing conspiracy 'need not be overwhelming.'" *Viola*, 35 F.3d at 44 (citation omitted). Indeed, participation in the conspiracy can be shown entirely through circumstantial evidence. *Id.*

We find that the Complaint states a valid § 1962(d) claim against Ortoli. Specifically, although Ortoli was not an operator or manager of the RICO enterprise, we find that the facts alleged evidence his knowing association with the Madanes Brothers' conspiracy to defraud the Plaintiff. The Court is satisfied that Ortoli's alleged actions—ranging from the restructuring of family assets, to drafting paperwork intended to negate Ms. Madanes' interest in the Artworks, to issuing false denials regarding his status as the Trustee of Baltimore and Westchase—are of the type that "logically would lead him to suspect" that he was part of a larger conspiracy. *Id.* at 44–45. That is, unlike

---

16. Commentators are divided on this issue. *Compare* G. Robert Blakely & Kevin P. Roddy, *Reflections on Reves v. Ernst & Young: Its Meaning and Impact on Substantive, Accessory, Aiding Abetting and Conspiracy Liability Under RICO*, 33 Am.Crim. L.Rev. 1345, 1514–16 & nn. 751–54 (explaining that *Reves* spoke only to § 1962(c) liability of a principal in the first degree, and that § 1962(d) should be interpreted against the background of general conspiracy law, not *Reves* ), *with* David B. Smith & Terrance G. Reed, *Civil RICO* ¶ 5.04, at 5–40.2 (1994) ("If Congress' restriction of section 1962(c) liability to those who operate or manage the enterprise can be avoided simply by alleging that a defendant aided and abetted and conspired with someone who operated or managed the enterprise, then *Reves* would be rendered almost nugatory.").

the defendant in *Viola* who committed two isolated sales of stolen goods and had no reason to know he was part of a larger conspiracy, Ortoli's alleged acts all had the common theme of enriching the Madanes Brothers at the expense of Ms. Madanes. Given the knowledge Ortoli possessed, especially in light of his status as the family attorney since 1984, the Court finds that the present allegations are sufficient to establish Ortoli's conspiratorial liability. *See, e.g., Morin v. Trupin*, 835 F.Supp. 126, 133–36 (S.D.N.Y.1993) (holding that although plaintiffs failed to state § 1962(c) claim against outside attorneys for directing principals in RICO enterprise to sign various legal documents, allegations that these same outside attorneys knowingly agreed with promoter of tax shelter to violate RICO and personally agreed to commit racketeering acts stated valid cause of action for conspiracy under § 1962(d)); *cf. A.I. Credit Corp. v. Hartford Computer Group, Inc.*, 847 F.Supp. 588, 601–02 (N.D.Ill.1994) (holding that although plaintiffs failed to adequately allege § 1962(c) claim against professional broker and its officer based on "operating or managing" enterprise, they adequately alleged RICO conspiracy to violate § 1962(a) against same defendants).

■ Baltimore is likewise liable under § 1962(d). As trustee for Hastings Trusts I–V, Baltimore had a unique vantage point to observe the fraud allegedly perpetrated against Ms. Madanes. Moreover, the Plaintiff has leveled specific allegations against Baltimore which establish the factual predicates necessary to show Baltimore's conspiratorial status. (Compl. ¶¶ 66–72, 78, 152–54.) For instance, Ms. Madanes explicitly alleges that Baltimore, along with its director Ortoli, participated in the scheme to defraud Ms. Madanes of her one-quarter undivided interest in the Artworks. (*Id.* ¶ 72.) Thus, the Plaintiff has articulated facts sufficient to permit an inference of Baltimore's liability under § 1962(d). *See, e.g., Spira*, 876 F.Supp. at 560–61; *131 Main St.*, 897 F.Supp. at 1531 (finding § 1962(d) liability

where plaintiff stated facts allowing inference that defendants knowingly embraced tax shelter fraud and agreed to commit acts in furtherance thereof).

### D. Personal Jurisdiction

Defendants Leiser Madanes and Procida [17] have filed a Rule 12(b)(2) motion to dismiss the Complaint as against them for lack of personal jurisdiction. The Court rejects their arguments.

■ This Court authorized limited discovery on the issue of personal jurisdiction but has yet to hold an evidentiary hearing. In this scenario, the Second Circuit's rule is that the plaintiff must make a prima facie showing supported by an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendants. *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

■ The RICO Act authorizes nationwide service of process. Accordingly, the jurisdictional inquiry under RICO focuses on the defendants' contacts with the entire United States, not just the forum state. *Herbstein v. Bruetman*, 768 F.Supp. 79, 81 (S.D.N.Y.1991). Thus, due process requires only that the defendants had minimum contacts with the United States. *Id.* In the case of a defendant not present in the jurisdiction, such contacts may be demonstrated by: (1) doing business in the United States; (2) doing an act in the United States; or (3) causing an effect in the United States by an act done elsewhere. *Id.*

■ The Plaintiff has asserted that Leiser had sufficient contacts with the United States. The Complaint alleges, *inter alia*, that Leiser transacted business in New York, committed predicate acts in New York, communicated through mail and wires with Ortoli in New York, and authorized Ortoli to act on his behalf in New York and elsewhere (Compl. ¶¶ 13, 23, 31, 34, 151.) These acts are all alleged to have been in furtherance of

---

**17.** This Opinion refers to Procida by its original name, rather than Pegaso, as it is currently called.

the Defendants' scheme to defraud Ms. Madanes, and the Plaintiff's offer of facts clearly supports her allegations. For instance, the Plaintiff submitted over twenty letters and memoranda demonstrating that Leiser was routinely consulted about the Madanes family's financial affairs in the United States. (*See* Kerr Aff. ¶¶ 18–19 and Exhs. 3–29.) One representative letter, sent from Leiser to Ortoli, explicitly directs Ortoli to undertake certain actions regarding investment property in New York. (Kerr. Exh. 24.) Such evidence suffices at this early stage of the litigation. *See CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir.1986) (joint control of business enterprise, similar to that existing in partnership or joint venture, evidences agency sufficient to confer personal jurisdiction); *Lancaster v. Zufle*, 165 F.R.D. 38, 41 (S.D.N.Y.1996) (noting that written power of attorney creates principal-agent relationship and finding personal jurisdiction where, among other things, defendant's attorney acted on defendant's behalf in banking transaction); *cf. Koskotas*, 1991 WL 177287, at *2 (ownership of bank accounts in United States was factor contributing to finding of personal jurisdiction under RICO). Accordingly, we find it entirely consonant with traditional notions of fair play and substantial justice that Leiser be subject to the jurisdiction of this Court. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 2184–85, 85 L.Ed.2d 528 (1985).

■ The case of Procida requires the Court to examine the co-conspirator theory of personal jurisdiction. It is well established under New York law that "the acts of a co-conspirator within the state may be attributed to an out-of-state defendant for the purposes of obtaining personal jurisdiction." *Sierra Rutile Ltd. v. Katz*, No. 90 CIV. 4913, 1992 WL 236208, at *8 (S.D.N.Y. Sept. 8, 1992) (explaining that "agent" has been defined to include co-conspirators under N.Y. C.P.L.R. § 302(a)(2)). Specifically, to establish jurisdiction with respect to a foreign co-conspirator, the plaintiff must allege facts warranting the inference that the foreign defendant was a member of the conspiracy and that the defendant "had an awareness (a) of the affects of its activity in New York and (b) that the activity of the co-

conspirators in New York was to the benefit of the out-of-state conspirators." *Id.*

■ The Plaintiff has alleged facts sufficient to establish Procida's co-conspirator status for purposes of conferring personal jurisdiction. Specifically, Ms. Madanes alleges that after she demanded information about the Madanes family's assets in July of 1993, Pablo directed the creation of Procida for the sole purpose of fraudulently hiding "the fact that funds held in and passing through the Procida Account were in fact owned and controlled by him." (Compl. ¶ 133, 135.) She further alleges that among the funds passing through the Procida Account were the same funds of which she had been defrauded by the Madanes Brothers and Ortoli in New York. (*Id.* ¶¶ 134–39.) Thus, she alleges both that Procida was aware of its part in an elaborate scheme which originated in New York with torts committed by Procida's co-conspirators, and that Procida in fact benefitted from such torts. Accordingly, these claims justify asserting personal jurisdiction over Procida. *See, e.g., Sierra Rutile*, 1992 WL 236208, at *10 (finding personal jurisdiction over out-of-state defendant where acts of co-conspirators included use of New York City banks and transactions with shipping companies in New York); *cf. Hade v. John Capozzi*, No. 91 CIV. 5897, 1996 WL 426394 (S.D.N.Y. Mar. 8, 1993) (personal jurisdiction established where out-of-state co-conspirator knowingly accepted benefits of stock fraud).

### E. Princess Lida

The Defendants argue that in light of the prior pending action in Switzerland, this action should be dismissed for lack of subject matter jurisdiction under the *Princess Lida* doctrine. *See Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939). This claim is meritless.

■ The *Princess Lida* doctrine applies when there is prior pending litigation and two conditions are met. First, both actions are *in rem* or *quasi in rem* in nature; and second, the relief sought requires the second court to exercise control over property al-

ready under the jurisdiction of the first court. *Id.* at 280, 305 U.S. at 464–66. In such a scenario, the second court must decline jurisdiction. *Id.; see, e.g., Chesley v. Union Carbide Corp.,* 927 F.2d 60, 66–67 (2d Cir.1991) (collecting cases).

■ Resolution of the Defendants' claim requires a comparison of the two actions. The Swiss suit is an *in personam* action against Pablo only, not Miguel or Leiser or any of the other Defendants here. (Baumgartner Decl. ¶¶ 7–8.) It asserts a contractual claim under Argentine law for Pablo's abuse of a mutual power of attorney and seeks solely money damages, *not* an accounting. (*Id.* ¶ 12.) The basis of the Swiss Court's assertion of personal jurisdiction over Pablo is an order—obtained by Ms. Madanes in a prior proceeding—that attached Pablo's portion of the Artworks and certain Swiss bank accounts. (*Id.* ¶¶ 6–7.) The purpose of the order was to secure assets sufficient to satisfy a later judgment, and thus only the *value* of Pablo's assets are at issue in the subsequent action. (*Id.* ¶¶ 7–8, 12.) Accordingly, under Swiss law Pablo is free to release items specifically attached, including his one-quarter interest in the Artworks, provided that he posts a bond covering the value of the selected assets. (*Id.* ¶ 7.)

In the matter before this Court, the Plaintiff has alleged multiple claims against multiple Defendants. Specifically, she seeks treble damages for the Defendants' violations of RICO, as well as compensatory and punitive damages for conversion, fraud and breach of fiduciary duties under New York law. Ms. Madanes also seeks restitution of the assets held in constructive trust by the Madanes Brothers, as well as a complete accounting. The Complaint asserts *in personam* jurisdiction over each of the individual Defendants. (Compl. ¶ 8.)

These facts fail to establish either of the two requirements for application of the *Princess Lida* doctrine. First, the actions in both fora are not *in rem* or *quasi in rem* in nature. Specifically, the Swiss action is an *in personam* action for damages that does not seek an accounting. Although the Defendants are correct to point out that the *Princess Lida* doctrine generally applies to

actions concerning the administration of trusts and marshalling of assets, not every such action invokes the doctrine. *See, e.g., Southwestern Bank & Trust Co. v. Metcalf State Bank,* 525 F.2d 140, 142–43 (10th Cir. 1975) (although state action to liquidate property subject to trust was clearly *in rem,* federal action was *in personam* where it consisted of damage claims "relate[d] entirely to the administration of the trust by the defendant trustee, and the performance of its obligations as trustee under the trust instruments," and thus *Princess Lida* doctrine was inapplicable). More precisely, there is a difference between an action to obtain money from a specific, limited fund, and an action that seeks damages against third parties for misdeeds potentially related to the fund. *See Central States v. Old Sec. Life Ins. Co.,* 600 F.2d 671, 675 n. 7 (7th Cir.1979) (noting inapplicability of *Princess Lida* doctrine where complaint merely sought to enforce a personal liability and obtain a money judgment, not to obtain possession of res already under jurisdiction of prior court). To the extent that the factual determinations—including fiscal calculations—in each scenario may overlap, the Supreme Court in *Princess Lida* wrote:

> [The fact that] if both courts were to proceed they would be required to cover the same ground.... [is] of itself not conclusive of the District Court's jurisdiction, for it is settled that where the judgment sought is strictly in personam, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other.

*Princess Lida,* 305 U.S. at 465–66, 59 S.Ct. at 280–81; *see also Markham v. Allen,* 326 U.S. 490, 494, 66 S.Ct. 296, 298, 90 L.Ed. 256 (1946).

Moreover, even assuming *arguendo* that both actions were *quasi in rem* in nature, the Court finds that according Ms. Madanes relief in this case is not inexorably linked to exercising control over *res* already under the jurisdiction of the Swiss District Court. Accordingly, this case is not analogous to *Chesley v. Union Carbide Corp.,* 927 F.2d 60 (2d

Cir.1991), upon which the Defendants place considerable reliance. The plaintiffs in *Chesley* were American attorneys who had previously brought suits in federal court on behalf of Indian victims of the Bhopal gas leak disaster in India. These cases were consolidated in the Southern District of New York, and then dismissed on grounds of forum non conveniens. Litigation in India eventually resulted in a $470 million settlement in favor of the Bhopal victims. Pursuant to the settlement agreement and at the direction of the Supreme Court of India, Union Carbide deposited the money into a settlement fund in an Indian Bank. *Id.* at 63. Although under the terms of the settlement agreement the Indian Supreme Court managed the disbursement of funds, the plaintiffs nevertheless brought suit in federal court requesting that the court: (1) order Union Carbide to submit to the district court a plan for the fund's distribution; and (2) compensate the lawyers in the Southern District litigation from that fund. *Id.* at 66. Ultimately, the Second Circuit dismissed the case under the *Princess Lida* doctrine. *Id.* at 67.

In contrast, this case does not necessarily require the Court to exert control over property already under the control of the Swiss District Court. Consider, for instance, Ms. Madanes' RICO claims, which seek treble damages for racketeering acts. All of the Defendants here are potentially liable, yet aside from Pablo, no other Defendant has even a fraction of his assets under attachment in Switzerland. Moreover, even with respect to Pablo's liability, the Plaintiff seeks to establish liability for a debt, not compel the relinquishment of specific, identifiable property in Switzerland. Indeed, although the Complaint asserts that stolen funds passed through Swiss accounts over which Pablo had control, it does not allege that such funds presently are in those same accounts.[18] Thus, no identifiable bar precludes this Court from rendering appropriate relief to Ms. Madanes while still respecting the integrity of the Swiss action. *See Central*

*States,* 600 F.2d at 675 n. 7 (holding that where prior state court had *in rem* jurisdiction, district court could maintain *in personam* jurisdiction and simply deny requests for conflicting *in rem* relief because "district court is fully capable of preventing inappropriate conversion of the suit to a proceeding truly in rem"); *cf. United States v. $3,000,000 Obligation,* 810 F.Supp. 116, 117–18 (S.D.N.Y.1993) (collecting cases and explaining that court exercising jurisdiction second does not lose powers to make orders which do not conflict with authority of first court). In short, absent the flawed presumption that payment of a judgment here would necessarily involve recourse to Pablo's Swiss assets, the *Princess Lida* doctrine is inapplicable.

### F. *International Comity*

The Defendants further contend that principles of comity counsel dismissal of this action in favor of the Swiss proceeding. The Court is unpersuaded.

> The Supreme Court has defined comity as: the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 143–44, 40 L.Ed. 95 (1895).

The general rule of comity is that the domestic court should exercise jurisdiction concurrently with the foreign court. *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987). If a judgment is reached first in the foreign court, it may then be plead as res judicata in the domestic court. *Id.* Absent a final judgment from another court, surrender of jurisdiction is justified only under exceptional circumstances. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25–26, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983). Moreover, surrender necessarily entails a

---

18. Indeed, as yet it is uncertain whether any assets of significance remain in Pablo's accounts in Switzerland. The Swiss order merely grants Ms. Madanes the right to attach assets up to a certain amount; it does not establish the value of the assets subsequently attached. In addition, the relevant banking secrecy laws in Switzerland provide for only limited disclosure of the substance of the attachment debtor's accounts. (Baumgartner Decl. ¶ 9.)

finding that the parties and issues in both litigations are the same or sufficiently similar such that the doctrine of res judicata may be asserted. *Herbstein v. Bruetman,* 743 F.Supp. 184, 188 (S.D.N.Y.1990).

■ The Swiss District Court has not yet reached a final judgment that can be plead as res judicata here. Indeed, those proceedings remain in their preliminary stages. (Russenberger Decl. ¶ 11.) Accordingly, this Court may not dismiss the Plaintiff's Complaint absent a showing of exceptional circumstances. *See, e.g., Herbstein,* 743 F.Supp. at 188 (finding Argentine case was at preliminary stage where formal investigation into possible misappropriation had just begun and there had not yet been any determination of actual wrongdoing).

The Defendants have failed to make a showing of exceptional circumstances. Neither the parties nor the issues are identical or substantially similar. The Swiss action identifies Pablo as the lone Defendant; by contrast, Ms. Madanes names ten Defendants in this action. *See id.* In addition, this action concerns activity that is not part of the Swiss action. Consider, for instance, the allegations concerning $7.5 million worth of fraudulent transfers from the New York Account, which are not part of the Swiss complaint The mere fact that "a number of similar issues need to be resolved" in both actions does not mandate dismissal; indeed, this is so even where "the circumstances out of which the two actions arise are identical." *Eskofot A/S v. E.I. DuPont De Nemours & Co.,* 872 F.Supp. 81, 90 (S.D.N.Y.1995) (holding that although underlying circumstances of two actions were identical, dismissal was not warranted where American company was not party to English action and plaintiff has stated claims relating to American antitrust law that would not be resolved in English action). The Court further notes that any determination by the Swiss District Court regarding Pablo's liability on Ms. Madanes' contractual claim would not dispose of the RICO claims in this action. For example, determining that Pablo is guilty on the contractual claim does not answer the question of whether he managed an international conspiracy; nor does a finding of innocence necessarily mean that no such conspiracy existed, especially among the other Defendants. *See id.; Herbstein,* 743 F.Supp. at 188 (holding that claim of misappropriation was distinguishable from claim of fraudulent inducement, even though underlying facts were same).

The principal cases upon which the Defendants rely are highly distinguishable. For instance, the Swiss action does not involve liquidation or bankruptcy proceedings of international significance. *See, e.g., In re Maxwell Comm. Corp.,* 93 F.3d 1036, 1039–40 (2d Cir.1996) (deference to English proceeding appropriate because death of media mogul Robert Maxwell had already resulted in establishment of "a unique judicial administration of the debtor corporation by parallel and cooperative proceedings in the courts of the United States and England aimed at harmonizing the laws of both countries and also aimed at maximizing the benefits to creditors and the prospects of rehabilitation"); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 998 (2d Cir.) (recognizing that comity is particularly important in context of foreign bankruptcy proceedings), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993). Nor does this litigation involve a scenario like that present in *Caspian Invs., Ltd. v. Vicom Holdings, Ltd.,* 770 F.Supp. 880 (S.D.N.Y.1991). There, after commencing suit abroad against a parent corporation, the plaintiff then filed suit in district court against the parent and its subsidiary. The court found that both actions "involve[d] interpretation of the same loan agreements"; the plaintiff alleged exactly "the same violations by both defendants of identical contractual obligations and [sought] the same relief"; and most importantly, the defendant not named in the first action "agreed to submit to the jurisdiction of the Irish court and to be bound by any determination by that court." *Id.* at 884. Not only do Ms. Madanes' cases lack the similarity evidenced in *Caspian,* but no jurisdictional proffer has been made here. This latter fact is significant because the Swiss District Court lacks personal jurisdiction over several key Defendants in this action. (Baumgartner Decl. ¶ 3.) Accordingly, the Swiss District Court would be unable to grant complete

relief as against all the Defendants. *See id.* (stating that adequacy of relief available in alternative forum is important consideration).

One final factor weighs in favor of the Plaintiff. Ms. Madanes claims that she sought the attachment orders against the Madanes Brothers as a prudential measure to insure that funds were available to satisfy a subsequent judgment. Under Swiss law, a plaintiff must commence an action within ten days or risk automatic annulment of the attachment order. (Baumgartner Decl. ¶¶ 10–11.) Given the jurisdictional uncertainties the Plaintiff faced in commencing this action, the Court finds credible Ms. Madanes's claim that her litigation strategy was motivated in part by prudential concerns, especially in light of the manifestly Byzantine manner in which the Madanes Brothers allegedly have deployed the family assets. As was explained in an analogous context:

> [The plaintiff] did reserve his rights to seek compensatory damages for [the defendant's] alleged wrongdoings merely to prevent the statute of limitations from expiring in Argentina. It was a "prudent" measure to ensure that [the plaintiff] would be able to recover some damages in the event that his planned suit in the United States was dismissed on procedural grounds. Such prudential filings cannot provide the basis for a finding of "duplicative litigation."

*Herbstein,* 743 F.Supp. at 188 (citing *Department of Econ. Dev. v. Arthur Andersen & Co.,* 683 F.Supp. 1463, 1485 (S.D.N.Y.1988)). In light of the foregoing, the Defendants' motion for dismissal on grounds of international comity is denied.

### G. *Forum Non Conveniens*

Finally, the Defendants maintain that this case should be dismissed on grounds of forum non conveniens, asserting that Argentina is a superior forum. Alternatively, the Defendants argue that Switzerland is a superior forum. In both instances, the Court disagrees.

█ Application of the doctrine of forum non conveniens requires a two-step inquiry. First, the district court must ascertain whether there exists an alternate forum that has jurisdiction to hear the case. Second, it must determine "the forum that will be most convenient and will best serve the ends of justice." *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). This latter assessment requires the court to weigh a variety of private and public considerations, as set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

█ In weighing the *Gilbert* factors, the court "starts with a presumption in favor of the plaintiff's choice of forum, especially if the defendant resides in the chosen forum." *Peregrine,* 89 F.3d at 46. The defendant can overcome this burden only by establishing that the *Gilbert* factors, both private and public, tilt strongly in favor of the alternative forum. *Id.* The private factors include: the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; and all other practical problems that could make the trial protracted, difficult or costly, such as choice of law issues and the need to translate documents. The public factors include: the administrative difficulties stemming from court congestion; the local interest in having controversies decided at home; the interest in having the trial in a forum that is familiar with the law governing the action; the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. at 843; *Murray v. British Broad. Corp.,* 81 F.3d 287, 293–94 (2d Cir.1996).

█ At the outset, the Defendants' position is flawed due to their failure to establish that an adequate alternate forum exists. "Ordinarily, a foreign forum will be adequate when the defendant is subject to the jurisdiction of that forum." *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991). This requirement refers to all defendants, not just the "primary" ones. *Watson v. Merrell Dow Pharms., Inc.,* 769 F.2d 354, 357 (6th Cir.1985) (finding that district court erred in characterizing corpo-

rate defendants as primary defendants and thus dismissing litigation against other named defendants, who were not subject to jurisdiction of alternate forum, due to their "lesser" status). Here, the Plaintiff claims that an Argentine court would be unable to assert personal jurisdiction over any Defendants other than the Madanes Brothers. (Gebhardt Decl. ¶ 5.) The Defendants dispute this assertion, and both sides have submitted affidavits purporting to demonstrate the veracity of their respective positions (*Id.; see also* Fiorito Reply Decl. ¶¶ 3–5.) [19] Given the ramifications of this dispute, the Court concludes that it would be improper to dismiss the case absent a proffer by all of the Defendants that they would be willing to consent to the jurisdiction of the Argentine court, as well as agree to satisfy any judgment reached by that court. *Cf. Mercier v. Sheraton Intern. Inc.*, 935 F.2d 419, 425–26 (1st Cir.1991) (finding that affidavit of Turkish professor, which was inconclusive on question of whether Turkey recognized claim for breach of contract, was insufficient to establish that Turkey was an adequate alternative forum). No such proffer has been made. Nor, we note, would one alter this Court's conclusion that dismissal is unwarranted because, as demonstrated below, the *Gilbert* factors do not strongly favor the Argentine forum.

██ The private interest factors do not tilt strongly in favor of Argentina. First, regarding access to sources of proof, the Court finds the testimony of witnesses in New York is likely to be as important as the testimony of witnesses located in Argentina. Specifically, although the Madanes Brothers and various of their advisers reside in Argentina, Ortoli, a central figure in establishing the validity of transactions concerning the family's assets, is located in New York, as is everyone associated with the R & B and RKB firms. Second, most of the crucial legal documents appear to be located in New York, as are witnesses who can authenticate them.

Third, the travel costs for witnesses will be significant regardless of the location of this trial, given that important witnesses are located in the United States, Argentina and even Switzerland. Fourth, the necessity for extensive translation will exist both in Argentina and the United States; again, key documents and witnesses are found in both countries. Fifth, although the power-of-attorney issue appears to require application of Argentine law, other issues, such as the question of whether Ortoli satisfied his fiduciary responsibilities, will require the application of New York law. Even the Defendants appear to concede the existence of choice-of-law problems regardless of where the trial occurs; for instance, one defense expert explained that even though the Swiss action invokes contractual claims under Argentine law, "because [some of] the assets are located in Switzerland, Swiss law may govern certain of the legal issues in the action." (Russenberger Decl. ¶ 13.) In sum, then, the Court believes that this trial will be difficult regardless of where it takes place, and thus the *Gilbert* private factors do not weigh strongly in favor of the Defendants. *See, e.g., Peregrine*, 89 F.3d at 46–47 (denying forum non conveniens motion in part because critical documents were located in New York and witnesses would be forced to travel regardless of where trial took place); *Herbstein*, 743 F.Supp. at 189 (finding that existence of American defendants, who committed acts of fraud in this country, weighed heavily in favor of maintaining action in United States); *see also Maganlal*, 942 F.2d at 168–69 (holding that need to apply foreign law was not dispositive factor, especially where key evidence regarding production and condition of goods was located in New York).

Neither do the public interest factors tilt strongly in favor of Argentina. First, a case "may not be dismissed simply because New York is a congested center of litigation, and defendants have made no showing that New York is prohibitively congested." *Id.* at 189

---

19. The Defendants have not advanced substantive arguments to counter the Plaintiff's claim that the Swiss District Court would not have jurisdiction over any Defendant other than Pablo. (*See* Baumgartner Decl. ¶¶ 14–15.) Given that

the possibility of dismissal in favor of Switzerland is negated by the Defendants' failure to meet this threshold requirement, the Court declines to weigh the *Gilbert* factors with respect to this forum.

& n. 4 (noting that Argentina is no less congested a legal forum than New York, and citing Argentine case in support of proposition that congestion in Argentine judicial system has even led to cases lasting for decades). Second, the United States "has a definite interest in correcting wrongs committed on its soil, and in deterring similar actions by other individuals and corporations." *Id.* at 188. Third, although the Plaintiff is from Argentina, that alone does not suggest that New York jurors do not have an interest in hearing this case; on the contrary, New York jurors have a strong interest in determining whether members of that state's local bar have abdicated their professional responsibilities. Fourth, as explained above, the choice-of-law issue may require application of foreign law regardless of where this case is litigated. Thus, the public interest factors do not weigh strongly in favor of Argentina. *See, e.g., Peregrine,* 89 F.3d at 47 (finding that New York had strong interest since several defendants lived there and key events occurred there); *Herbstein,* 743 F.Supp. at 188–89 (same); *see also Maganlal,* 942 F.2d at 169 (overruling district court's dismissal of action to India after determining that New York had significant interest in hearing breach of contract case where defendant was New York corporation and action was for breach of contract). Accordingly, even bearing in mind that a foreign plaintiff is not entitled to as much deference as a domestic plaintiff, *Murray,* 81 F.3d at 290, the Court believes that dismissal on grounds of forum non conveniens is unwarranted.

### CONCLUSION

For the reasons stated above, the RICO § 1962(c) claim against Ortoli, R & B, RKB and Baltimore is dismissed. In all other respects, the Defendants' motions are denied. With regard to future proceedings, the parties are directed to confer with each other and submit a proposed discovery schedule by November 10, 1997.

SO ORDERED.