775 A.2d 601 (2001)
341 N.J. Super. 489
EXXON RESEARCH AND ENGINEERING COMPANY, Exxon Services Company, Inc., and Exxon Services Venezuela, Inc., Plaintiffs-Appellants, and
Fluor Daniel, Inc., Plaintiff-Intervenor,
v.
INDUSTRIAL RISK INSURERS, New Hampshire Insurance Company, CIGNA Corporation, a.k.a. CIGNA Worldwide and CIGNA Insurance Company of Europe, S.A.N.V., and International Oil Insurers, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 25, 2001.
Decided June 27, 2001.
*602 John J. Carlin, Jr., Florham Park, for appellants (Mr. Carlin and Arthur G. Warden, III, on the brief).
Myron Kirschbaum, New York (Kaye, Scholer, Fierman, Hays & Handler), of the New York bar, admitted pro hac vice, and *603 Robert Vinci, Florham Park, for respondents (Drinker, Biddle & Shanley and Mr. Kirschbaum, attorneys; Thomas F. Campion, Morristown, Mr. Vinci and Mr. Kirschbaum, of counsel).
Before Judges BAIME, CARCHMAN and LINTNER.
The opinion of the court was delivered by LINTNER, J.A.D.
On June 3, 1996, the plaintiffs, Exxon Research and Engineering (ER & E), Exxon Services Company (ESC) and Exxon Services Venezuela Inc. (ESV), (hereinafter referred to collectively as Exxon plaintiffs), filed a complaint against reinsurers, Industrial Risk Insurers (IRI), New Hampshire Insurance Company (NHI), International Oil Insurers (IOI), and CIGNA Corporation, A.K.A. CIGNA Worldwide and CIGNA Insurance Company of Europe (CIGNA). In part, plaintiffs sought a declaration that they were not liable for damages resulting from a fire that occurred at a Venezuela oil refinery in 1989. They also sought an injunction against defendants from enforcing, in any jurisdiction, a judgment yet to be rendered, arising from a 1991 Venezuela lawsuit dealing with the fire. After almost three years of discovery on the issues of comity, jurisdiction, and forum selection, Judge Miniman granted summary judgment dismissing plaintiffs' complaint with prejudice, on the grounds of international comity and the forum selection clause appearing in the Technical Service Agreement.
We affirm Judge Miniman's order dismissing plaintiffs' complaint based upon application of principles of international comity. We decline to consider the appropriateness of the dismissal based solely upon the forum selection provisions of the relevant contracts, but instead consider the contractual provisions as a factor bearing upon the comity analysis. Likewise, because we defer to the Venezuela court on comity grounds, we need not, at this time, consider the appropriateness of the judge's finding that plaintiffs failed to properly prosecute its declaratory judgment action by omitting necessary parties. We affirm the dismissal of plaintiffs' complaint against CIGNA. However, we modify the dismissal with prejudice of plaintiffs' complaint against all defendants and enter, in its place, a dismissal without prejudice.

I.
In the 1970s, plaintiff ER & E designed a process known as Flexicoking for converting crude oil into light petroleum products. ESC licensed Flexicoking for use at the Amuay Refinery in Venezuela. The refinery was owned and operated by Lagoven, a subsidiary of the national oil company of Venezuela, Petroleos de Venezuela, S.A. (PDVSA). Plaintiff-intervenor, Fluor Daniel (Fluor), provided engineering, construction, and technical assistance. The construction of the Flexicoking Unit at Amuay Refinery was completed in 1982 and, in 1986, ESC agreed to provide technical assistance for its operation. In 1989, a fire started in the unit causing damage estimated at almost $40,000,000. However, pursuant to a settlement agreement, Lagoven was paid $20,000,000 by its insurance companies (Seguros Caracas), which in turn were reimbursed that sum by their reinsurance consortium (twenty-one companies). In 1991, the reinsurers assigned their rights to Desarrolos Oriflama (Oriflama), a corporation set up for the sole purpose of litigating the matter. Oriflama then filed an action against the Exxon plaintiffs in Venezuela, alleging that *604 their faulty design and flawed technical assistance were responsible for the fire.
Plaintiffs' 1996 complaint named the four lead reinsurers, covering approximately seventy-five percent of the loss, as defendants. The complaint essentially alleged that (1) plaintiffs were not liable for the damages resulting from the fire; (2) the Venezuela litigation did not provide an adequate forum for a fair resolution of the Amuay fire dispute; (3) Oriflama was a sham corporation and alter ego of defendant reinsurers; (4) the assignment of the reinsurers' rights to Oriflama was invalid; and (5) defendants should be responsible for reimbursing plaintiffs for the costs of defending the Venezuela action in the event plaintiffs prevailed. Fluor was permitted to intervene as a plaintiff.[1]
On December 11, 1996, Judge Ahto denied, without prejudice, defendants' motion to dismiss the complaint or, alternatively, stay the action on the ground of comity, and permitted discovery to proceed on the issues of comity and jurisdiction. On January 31, 1997, defendants filed an answer denying the allegations and asserting ten affirmative defenses, including the doctrines of comity and forum non conveniens, lack of personal jurisdiction, and the failure to join an indispensable party (Oriflama). Plaintiffs filed a motion to strike the defense of lack of personal jurisdiction, in response to which defendants CIGNA and IOI filed a cross-motion to dismiss the complaint for lack of personal jurisdiction. On April 18, 1997, plaintiffs' motion to strike was granted, and defendants' motion to dismiss was denied. We denied defendants' motion for leave to file an interlocutory appeal on June 10, 1997.
On May 29, 1998, Fluor filed a motion seeking to enforce a settlement agreement between itself and defendants, including Oriflama. After taking testimony from witnesses, Judge Miniman granted defendants' motion, which was memorialized in her order of March 2, 1999.
On February 19, 1999, defendants filed a motion for summary judgment or, in the alternative, a motion to stay the action pending final resolution of the Venezuela litigation. On March 31, 1999, plaintiffs filed a cross-motion for summary judgment for a declaration that "decennial" liability did not attach, and that they did not give negligent advice. Plaintiffs also sought a declaration holding defendant reinsurers responsible for any liability for plaintiffs' legal fees assessed against Oriflama, in the event plaintiffs were successful in defending the Venezuela litigation. Judge Miniman issued a written decision on March 29, 2000, and on the same day entered an order dismissing the complaint with prejudice.
In ruling in defendants' favor, the judge found that comity required dismissal of the action because the Venezuela suit was filed first; both cases involved substantially the same parties, claims, and legal issues; the Venezuela courts provided an opportunity for adequate relief for plaintiffs; and plaintiffs had not established any special equities justifying retaining the action in New Jersey. She also found that declaratory judgment was inappropriate because it would not terminate the proceedings in Venezuela, and plaintiffs had not joined Oriflama or the seventeen other reinsurers providing twenty-five percent of the total coverage. She also based her ruling on the existence of the forum selection clause in the Technical Assistance Agreement. Finally, she found that defendant CIGNA Corporation was a stock holding company, not an insurance company, *605 and had neither sold nor otherwise provided reinsurance covering the Amuay Refinery.
Plaintiffs appeal, raising the following points:
POINT I
THE COURT BELOW ABUSED ITS DISCRETION BY DISMISSING THE COMPLAINT OF THE EXXON PLAINTIFFS FOR FAILURE TO STATE A CLAIM UNDER THE NEW JERSEY DECLARATORY JUDGMENT ACT. POINT II

THERE ARE NO ABSENT PARTIES WHOSE RIGHTS CANNOT BE ADJUDICATED BY A DECLARATORY JUDGMENT. POINT III

CIGNA CORPORATION IS A PROPER PARTY TO THIS ACTION. POINT IV
THE DEFENDANT REINSURERS ARE NOT ENTITLED TO A STAY OR DISMISSAL BASED UPON THE RULES OF INTERNATIONAL COMITY IN AN IN PERSONAM ACTION.
A. The Parties in the Venezuelan proceeding and in the matter in the New Jersey Superior Court are not substantially the same.
B. The Claims and Legal Issues in the Venezuelan proceeding and the matter in the New Jersey Superior Court are not substantially the same.
C. Adequate relief is not available to the Exxon plaintiffs in the Venezuelan proceeding.
D. Promotion of judicial efficiency leans to New Jersey.
E. Fairness to all parties negates entry of a stay.
F. Temporal filing favors New Jersey action.
POINT V
THE COURT BELOW ABUSED ITS DISCRETION IN FINDING THAT THE EXXON PLAINTIFFS FAILED TO DEMONSTRATE "SPECIAL EQUITIES" SUFFICIENT TO WARRANT CONTINUATION OF PROCEEDINGS IN NEW JERSEY. POINT VI

THE TECHNICAL SERVICE AGREEMENT DOES NOT PROVIDE FOR EXCLUSIVE JURISDICTION IN VENEZUELA.
POINT VII
DISMISSAL OF THE COMPLAINT WITH PREJUDICE BECAUSE OF THE PENDING SUIT IN VENEZUELA WAS IMPROPER.

II.
We extract the following relevant facts from the voluminous record. Flexicoking is a process developed by ER & E to obtain light petroleum products (gasoline, gas oil, coke, and coke gas) from heavy crude oil. A reactor, a heater, and a gasifier are utilized in the process. The gasifier is a large vessel divided horizontally by a steel grid plate, which is perforated by more than 1200 orifices, each of which is attached to a "grid cap" that disperses air and steam from the bottom chamber into the heat-protected chamber above the grid plate. The process was first demonstrated in 1974 and used commercially in Japan in 1976. The Amuay Refinery was the second commercial plant to use the process.
The relationship between plaintiffs and Lagoven began in January 1978, when ESC and Lagoven entered into an agreement (the Project Agreement) to modify the Amuay Refinery by installing and licensing use of the Flexicoking process, training Lagoven personnel, and providing advisory engineering services. At the same time, the parties entered into a Process *606 Guarantee Agreement, under which ESC guaranteed the performance of the Flexicoking Unit. In March 1978, Lagoven contracted with Fluor for engineering and construction to complete the unit, which was permitted under the Project Agreement. Fluor then subcontracted the design, engineering, procurement, erection, and testing of the unit to Van Dam/CBI.
In March 1986, Lagoven's parent company, PDVSA, and ESC entered into the Technical Assistance Agreement under which ESC would provide technical assistance and technological services to Lagoven. PDVSA then assigned the agreement to Lagoven. The work under the Technical Assistance Agreement was performed mostly in ER & E's Florham Park, New Jersey, offices, where the design work on the Flexicoking process had also been conducted. Plaintiff Exxon Services Venezuela (ESV) entered into the Agreement to Assign Personnel in 1985 by which its personnel were assigned to Lagoven in 1985.
Under the Project Agreement and the Technical Assistance Agreement, ESC was liable for Lagoven's damages, only if they were caused by the "manifest negligence" or "intentional acts or intentional omissions" of ESC or its employees. The agreements provided the following provisions regarding resolution of disputes and choice of law.
The Project Agreement
11.01 This agreement, in regard to its validity, interpretation and compliance will be governed by the laws of the Republic of Venezuela, and the parties will have the right to all the resources available in the court or in the Tribunal before which any judicial action may be brought.
The Process Guarantee Agreement
10.01 Any difference or disagreement of a technical nature that may arise between the parties under this Agreement, that cannot be settled amicably, shall be settled by arbitration in the city of Paris, France, under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the Rules.
....
11.01 This Agreement shall be governed by the law of the Republic of Venezuela.
The Technical Assistance Agreement
14.01 This Agreement, in regard to its validity, interpretation and compliance will be exclusively governed by the laws of the Republic of Venezuela, without for any reason being able to give rise to foreign claims, and the parties will have the right to all the appeals available before the Tribunals of Venezuela, under whose jurisdiction they expressly declare that they are subject to. For all the purposes of this Agreement, the parties choose the city of Caracas as special and exclusive domicile.
Article 14.01 of The Agreement to Assign Personnel contained the identical language as found in 14.01 of the Technical Assistance Agreement.
Between November 1982, when Amuay began operating the Flexicoking Unit, and July 20, 1989, when the fire occurred, four runs had been completed. After each run, four corresponding general repairs were carried out, during which time the unit was shut-down. At the time of the fire, the fifth run was in progress, and the fifth general repair was scheduled for October 1989. All the grid caps had been replaced during the previous general repairs due to erosion.
In February 1989, Lagoven noticed elevated temperatures in the gasifier and requested ESC's advice. In March, ER & E *607 warned Lagoven that damaged grid caps might be the cause and recommended continuous monitoring of the situation. In April, Lagoven asked ESC to evaluate the hot spots on the grid, which it accomplished from its New Jersey facility. Lagoven's own study of the problem concluded that the high temperature readings were due to instrument error. On May 5, 1989, Lagoven instructed ESC to stop working on the matter, which it confirmed in writing on June 15, 1989. Some time prior to the fire, Lagoven disconnected the grid temperature indicators.
On July 12, 1989, an emergency shutdown of the Flexicoking Unit was activated due to a high pressure differential between the reactor and the heater. Repairs were made and the process was operating at its normal level by July 19. On July 20, 1989, the fire started in the gasifier when the grid plate collapsed, which in turn ignited other fires in the refinery. The fires were extinguished within two hours, but not before twenty-three workers suffered first and second-degree burns.
After the fire, there were several independent investigations of its cause. One investigation report, prepared in 1989 by Lagoven employees, concluded that the cause of the fire was the loosening of grid caps, which led to the collapse of the grid plate. Another 1989 report, prepared by Ewan Cresswell of Cunningham, International Adjusters Partnership, concluded that the cause of the collapse of the grid plate was a progressive loosening of the grid cap securing nuts due to poor quality and inadequate packing materials installed during the fourth general repair. A third investigation, completed in 1996 by a three-member panel of experts appointed by a Venezuela judge after Oriflama filed its liability action, concluded that changes in the manufacture and installation of grid caps during the four general repairs may have caused the fire, but the design, construction, and technical assistance provided by plaintiffs could not be established as causes of the fire.
Although Lagoven presented a claim to its insurers for over $38,000,000, on July 17, 1991, it agreed to accept a settlement of $20,000,000. According to a Cresswell's report, Lagoven agreed to the settlement because it accepted some degree of responsibility for the grid plate collapse due to its own faulty instrument settings. On the same day that Lagoven accepted the settlement, Oriflama, as assignee of the reinsurance companies, filed its complaint against the Exxon plaintiffs and Fluor. One basis for the complaint was "decennial" liability (Article 1637 of the Venezuela Civil Code), under which a designer of a plant is responsible for damages due to design defects for up to ten years after construction. The complaint also alleged that the Exxon plaintiffs breached contractual obligations by giving insufficient, erroneous, and untimely advice.
Oriflama was formed by defendants' Venezuela law firm, Baumeister and Brewer, shortly before July 19, 1991, at a point in time that the statute of limitations period was about to expire, in order to facilitate meeting the filing deadline. According to plaintiffs' complaint, the corporation's total capitalization was $21.50 and its shares were owned by the two partners in the law firm, who were designated as directors. Baumeister and Brewer also serve as Oriflama's attorneys. The exclusive corporate activity of Oriflama is pursuit of the Venezuela litigation, and its headquarters is the Caracas office of Baumeister & Brewer.
Venezuela civil procedure does not follow the American convention of a discrete trial, but rather provides for a longer period during which evidence is submitted to, and testimony is taken, by designated lower *608 courts. Each party files a written offer of evidence that it intends to introduce, including documents and testimony, and then has the opportunity to submit written objections to the other party's offer of evidence. The lower courts, which take testimony, are not authorized to rule on substantive objections; those are ruled on later by the trial court that makes the final ruling on the merits.
In September 1992, Oriflama submitted its offer of evidence, including a witness list containing the names Lawrence Leonard and Cresswell, both authors of reports that Oriflama intended to submit as evidence. Under Venezuela law, authors of reports must ratify their work before it is accepted into evidence. In their opposition papers, plaintiffs objected to the admission of Leonard's report. Plaintiffs, however, did not offer any documentary evidence other than a revised Spanish translation of one of the documents that Oriflama submitted. Nor did they offer any of their own witnesses. They relied instead on the documents submitted by Oriflama and on cross-examination of their adversary's witnesses.
In October 1992, plaintiffs asked the Venezuela court to require Oriflama to post a bond to guarantee their attorneys' fees and courts costs if they prevailed, because Oriflama's capital was too low to cover such expenses. In January 1993, the court denied the motion on the ground that Venezuela civil procedure did not provide for such a bond. Furthermore, it held that prosecution of a lawsuit by a corporation with capital stock worth less than the amount of damages requested is in accordance with Venezuela law. Under the Venezuela legal system, the losing party must pay the winning party's legal costs, but recovery of such costs may be the subject of a future lawsuit.
Thereafter, plaintiffs filed a motion requesting that the court rule that it did not have jurisdiction over the case and that, under the Process Guarantee Agreement, the case should be submitted to arbitration in Paris. Plaintiffs' motion was denied, and the matter was referred to the Venezuela Supreme Court for mandatory review. In June 1994, the Supreme Court denied the motion based on the parties' contractual choice of Venezuela law.
The evidence period of the Venezuela trial began in October 1994, and ended in March 1996, with actual testimony being taken between October and December 1994. Leonard, who lived in Virginia, was served with a summons on October 28, 1994, requiring him to testify in Venezuela on November 2. (He was originally scheduled to testify on November 9.) On October 31, plaintiffs applied to the United States District Court for the Western District of Virginia for an order, pursuant to 28 U.S.C.A. § 1782, enjoining Leonard from testifying in Venezuela before submitting to a deposition in Virginia on November 7. The federal court issued its order enjoining Leonard from testifying without first submitting to a deposition on November 1. On that same day, Leonard was served with the federal court order in his hotel room in Caracas. Notwithstanding having been served with the federal court order, Leonard appeared in the Venezuela Court the next day as scheduled, identified himself, and ratified his report. Plaintiffs' counsel objected to any further testimony by him and gave Judge Velazco a copy of the federal order. It was read into the record, but the judge overruled plaintiffs' objection to Leonard's testimony. On direct examination, Leonard ratified a written report as his own, but when Fluor's cross-examination began, he refused to answer questions due to the federal court's injunction. Plaintiffs' counsel objected, and Judge Velazco adjourned the *609 hearing without ruling on the objections. The following day, Judge Velazco asked Leonard whether he was prepared to answer plaintiffs' questions; when Leonard said that he could not do so, the judge closed the hearing. Plaintiffs' substantive objection to Leonard's testimony and report are awaiting a decision by the Venezuela appellate court.
On November 7 and 8, 1994, Leonard's deposition was taken in Virginia by the Exxon plaintiffs. Leonard testified that ESC's advice to Lagoven had been correct. Although he indicated in his report that ER & E should have advised Lagoven to shut down the Flexicoking Unit on July 12, 1989, he acknowledged that he had seen a telex from Lagoven terminating ESC's services on May 5, 1989. According to plaintiffs, Leonard's deposition testimony is inadmissible in the Venezuela trial.
Cresswell appeared before the Venezuela court, ratifying his report dated August 9, 1991. He acknowledged, in a deposition taken by plaintiffs' counsel in 1998, that this report was a redacted version of the settlement report that he had submitted to the reinsurers and that some of his conclusions as to the fire's cause had been "corrected." In February 1999, the Exxon plaintiffs filed a motion to bring the Venezuela court's attention to the altered report. As of the present time, there has not been a ruling on the matter. During Cresswell's deposition, he also acknowledged that he passed along confidential documents to consultants retained by the reinsurers. Among those documents was the Technical Assistance Agreement.
Plaintiffs assert that Judge Miniman's analysis of the comity was flawed because it did not recognize the difference between in personam and in rem actions, when considering comity, thus placing upon them an overly stringent burden of proof. They also maintain that, notwithstanding the use of an improper test, the judge's findings represent a misapplication of the principles of comity because: (1) the parties in both actions were not substantially the same; (2) the New Jersey action included issues not before the Venezuela court; (3) adequate relief is not possible in Venezuela; (4) judicial efficiency favors maintenance of the New Jersey action; (5) the interest of fairness favors the New Jersey proceeding because ER & E's business reputation could be irreparably harmed if it is not given the opportunity to defeat the charge that it gave improper advice to Lagoven; and (6) they sufficiently demonstrated that special equities favored continuation of the New Jersey action.

II
We first address plaintiffs' contention that the principles of international comity require a domestic court to exercise concurrent jurisdiction instead of deferring to an earlier filed action when the earlier action is filed outside the sovereign. Comity is the recognition that one nation gives to the "legislative, executive or judicial acts of another nation." Hilton v. Guyot, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L. Ed. 95, 108 (1895). It is more than a "mere courtesy" but less than an "absolute obligation." Fantony v. Fantony, 21 N.J. 525, 533, 122 A.2d 593 (1956). It is "grounded in the policy of avoiding conflicts in jurisdiction, ... and the general principle that the court which first acquires jurisdiction of an issue has precedence, in the absence of special equities." Ibid. We have explained, "[i]t has become necessary and commonplace in a national economy for courts to interpret and enforce the laws of other jurisdictions." Cogen Techs. v. Boyce Eng'g Int'l, Inc., 241 N.J.Super. 268, 273, 574 A.2d 1018 (App.Div.), certif. denied, 122 N.J. 358, 585 *610 A.2d 368 (1990). Courts no longer distrust the proceedings of other jurisdictions and thus may refuse to proceed in a "vexatious" action focusing on a matter already being heard by a court of another jurisdiction. Id. at 272, 574 A.2d 1018.
The only New Jersey cases dealing with dismissal of an action in deference to a parallel proceeding in a foreign country involve divorce and custody matters. In Fantony, supra, 21 N.J. at 535-36, 122 A.2d 593, we refused to recognize a Cuban custody decree, and relied on New Jersey's policy of protecting the interests of children domiciled within its territory. In addition, we noted that the child's father had filed an action seeking custody of the child in New Jersey before he filed the Cuban action; the mother had neither been served by nor appeared before the Cuban court; and the Cuban court had not been informed that there was a contested custody case in the United States before awarding custody of the child to the father. Id. at 532, 533-36, 122 A.2d 593.
In Gosschalk v. Gosschalk, 48 N.J.Super. 566, 579-80, 138 A.2d 774 (App.Div.), aff'd, 28 N.J. 73, 145 A.2d 327 (1958), we declined to stay the New Jersey divorce action filed by the husband in deference to a prior divorce action filed by the wife in Holland, because the Dutch suit had not yet been tried. We observed that the "granting of a stay is discretionary with the trial court, limited only by special equities showing abuse of discretion in that injustice would be perpetrated on the one seeking the stay, and no hardship, prejudice or inconvenience would result to the one against whom it is sought." Id. at 579, 138 A.2d 774.
In Ivaldi v. Ivaldi, 288 N.J.Super. 575, 589, 672 A.2d 1226 (App.Div.), rev'd, 147 N.J. 190, 685 A.2d 1319 (1996) on grounds of forum non conveniens, we held that international comity required the New Jersey court to defer to the divorce and custody proceedings that had already begun in Morocco. The family lived in Morocco before emigrating to New Jersey, where they separated. Id. at 579, 672 A.2d 1226. Their separation agreement allowed the mother, who had physical custody of her daughter, to reside in another country as long as she allowed the father visitation in his country, and there was no evidence suggesting that the court of Morocco would not protect the best interests of the child. Id. at 581, 588, 589, 672 A.2d 1226.
The general rule is to defer to the court which first acquires jurisdiction, absent the existence of special equities. See, e.g., Yancoskie v. Delaware River Port Auth., 78 N.J. 321, 324, 395 A.2d 192 (1978); Cogen Techs., supra, 241 N.J.Super. at 272, 574 A.2d 1018 (App.Div.), certif. denied, 122 N.J. 358, 585 A.2d 368 (1990). As we have recently acknowledged, "[t]his principle has particular efficacy, and takes on added urgency, in light of the nationalization and globalization of our economy." Bass v. DeVink, 336 N.J.Super. 450, 455, 765 A.2d 247 (App. Div.2001). The basic principle that motivates us to avoid parallel litigation of previously instituted suits grows out of our respect for the laws of other jurisdictions and a policy favoring efficient use of judicial resources. Id. at 455-56, 765 A.2d 247.
Although the principle of comity grows out of a predilection toward abstention, its application is nevertheless flexible, being dependent upon the "special equities" of the case, the existence of which are left to the sound discretion of the trial court, which must essentially determine whether it is fair to have its citizens' rights adjudicated by a foreign court. For example, in Yancoskie, supra, 78 N.J. at 324, 395 A.2d 192, a wrongful death action in which the Court deferred to an earlier *611 filed Pennsylvania action, the Court applied "the general rule that the court which first acquires jurisdiction has precedence in the absence of special equities." The Court said that there were no special equities favoring prosecution of the matter in New Jersey, noting that the defendant was a bi-state agency, the plaintiffs were Pennsylvania residents, the accident occurred on the Pennsylvania side of the Delaware River, and the action was being prosecuted under the Pennsylvania wrongful death statute. Id. at 323-24, 395 A.2d 192.
The test articulated in American Home Prods. v. Adriatic Ins. Co., 286 N.J.Super. 24, 668 A.2d 67 (App.Div.1995), relies on factors similar to those used by federal courts considering a comity stay or dismissal in deference to a parallel foreign proceeding. The difference is basically procedural dealing with the allocation of burden of proof. In American Home Products, we placed the initial burden on the moving party to establish that (1) there is a first-filed action in another state; (2) both cases involve the same parties, the same claims and the same legal issues; and (3) the plaintiff will have the opportunity for adequate relief in the prior jurisdiction. Id. at 37, 668 A.2d 67. Once these requisites have been established, the moving party enjoys a "clear entitlement to comity-stay relief" and the burden falls upon the plaintiff to demonstrate that "special equities" exist that are sufficiently compelling to permit the action to proceed. Ibid.
In the federal system, parallel suits are defined as those actions in which "substantially the same parties are litigating substantially the same issues simultaneously...." Schneider Nat'l Carriers, Inc. v. Carr, 903 F.2d 1154, 1156 (7th Cir.1990). Once a determination is made that two suits are parallel, the party seeking abstention has the burden to establish that "exceptional circumstances" warrant dismissal or a stay. Madanes v. Madanes, 981 F.Supp. 241, 264 (S.D.N.Y.1997); Herbstein v. Bruetman, 743 F.Supp. 184, 188 (S.D.N.Y.1990). The placement of the burden of proof on the party challenging parallel litigation flows from federal abstention cases and emphasis on concurrent jurisdiction, which is derived from the federal courts' obligation to hear controversies under Article III of the United States Constitution. James P. George, Parallel Litigation, 51 BAYLOR L. REV. 769, 906 (1999) (citing Colorado River Water Conserv. Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483, 498).
Where our rule relies upon the traditional concepts of comity which afford respect to proceedings in other jurisdictions and judicial economy, the federal courts, although mandated to exercise jurisdiction which is conferred upon them, "in exceptional cases ... should stay a suit and await the outcome of parallel proceedings as a matter of `wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation.'" Finova Capital Corp. v. Ryan Helicopters USA Inc., 180 F.3d 896, 898 (quoting from Colorado River Water Conserv. Dist., supra, 424 U.S. at 817, 96 S.Ct. 1236, 47 L.Ed.2d 483.) The same general principles have been applied by the federal court to parallel proceedings regardless of whether they arise from similar actions brought in state or foreign courts. Ibid.
The burden of proof, regarding the predicate factors, in both our courts and the federal courts is similarly placed upon the moving party. In both systems the moving party must establish the existence of another lawsuit in a foreign jurisdiction, the similarities of parties and claims and *612 the plaintiff's opportunity for adequate relief in the extra jurisdictional litigation. The only aspect of the predicate factors which differs between the two systems is that, here, the status of the other lawsuit as having been filed first is included as a predicate factor, whereas in the federal system, first-to-file status is considered as one of the factors establishing exceptional circumstances. Ibid. The remaining factors, whether labeled "special equities" or "exceptional circumstance," are essentially the same and equally applicable to the ultimate determination in both systems regardless of which party carries the burden of proof. As we will see, the "special equities" identified by us in American Home Products, supra, 286 N.J.Super. at 38-40, 668 A.2d 67, including convenience and fairness to the parties, relative progress of the earlier filed law suit, and connection to the respective forums, are identical to factors recognized by the federal courts as those forming a basis for establishing "exceptional circumstances."
Federal courts, where most international comity issues are addressed, have generally applied a variety of factors in determining exceptional circumstances, which are substantively similar to the factors which bear upon abstention as enunciated in American Home Products. While some have kept the analysis limited, others have considered numerous factors in determining whether "exceptional circumstances" exist. Madanes, supra, 981 F.Supp. at 264; Neuchatel Swiss Gen. Ins. Co. v. Lufthansa Airlines, 925 F.2d 1193, 1194 (9th Cir.1991) (citing Colorado River Water Conserv. Dist., supra, 424 U.S. at 813, 96 S.Ct. at 1244, 47 L.Ed.2d at 496 (1976)). But see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16, 103 S.Ct. 927, 936, 74 L.Ed.2d 765, 780 (1983).
The following eight factors, have recently been identified as appropriate for the federal court to consider in exercising its discretion in favor of, or against, abstention.
(1) the identity of the court that first assumed jurisdiction over the property; (2) the relative inconvenience of the federal forum; (3) the need to avoid piecemeal litigation; (4) the order in which the respective proceedings were filed; (5) whether federal or foreign law provides the rule of decision; (6) whether the foreign action protects the federal plaintiff's rights; (7) the relative progress of federal and foreign proceedings; and (8) the vexatious or contrived nature of the federal claim.

[Finova Capital Corp., supra, 180 F.3d at 898-99.]
See also Ingersoll Mill. Mach. Co. v. Granger, 833 F.2d, 680, 685 (7th Cir.1987); Ludgate Ins. Co. Ltd. v. Becker, 906 F.Supp. 1233, 1242 (N.D.Ill.1995); Lumen Constr., Inc. v. Brant Constr. Co., Inc., 780 F.2d 691, 694 (7th Cir.1985); Brinco Mining Ltd. v. Fed. Ins. Co., 552 F.Supp. 1233, 1240 (D.D.C.1982); I.J.A., Inc. v. Marine Holdings Ltd., Inc., 524 F.Supp. 197, 198 (E.D.Pa.1981).
The similarity of the factors used by both systems is self-evident. Fairness is a factor often relied on by the federal courts. For example, in Eskofot A/S v. E.I. Du Pont De Nemours & Co., 872 F.Supp. 81, 90 (S.D.N.Y.1995), the court refused to stay or dismiss the federal antitrust action against an American company and its British subsidiary, because the earlier suit brought by the plaintiff against the British subsidiary in England was for breach of contract and would not reach the American antitrust claims. However, in Caspian Inv. Ltd. v. Vicom Holdings Ltd., 770 F.Supp. 880, 885 (S.D.N.Y.1991), the court dismissed a breach of contract action brought by a British corporation against a Georgia subsidiary of an Irish corporation in deference *613 to a first-filed Irish action, because the actions were virtually identical, the parent company had agreed to submit to the jurisdiction of the Irish court, the Irish action had proceeded beyond an initial stage, and there was no indication that the parties would be prejudiced or treated unfairly if the entire dispute was resolved in the Irish court.
The relative progress of the foreign action is another similar factor identified as a prime consideration by the federal courts. In Herbstein, supra, 743 F.Supp. at 188, the court refused to dismiss or stay a fraud action because the earlier filed Argentina action was still in its preliminary stages and neither the parties nor the issues were significantly similar. In American Cyanamid Co. v. Picaso-Anstalt, 741 F.Supp. 1150, 1159 (D.N.J.1990), the court refused to stay an action in deference to a first-filed French action because there was no indication that the French court had taken any action on the matter. The court also said that the "first to file rule" only applied to similar lawsuits pending within the same sovereign's jurisdiction. Ibid. See also Finova Capital Corp., supra, 180 F.3d at 900 (staying the federal proceedings pending resolution of a contract dispute in St. Lucia applying several factors including the fact that the suit in St. Lucia was the first to be filed.)
Another factor similar to both systems involve cases arising from contractual disputes involving agreements by which the parties submit to the jurisdiction of the foreign court. Most state and federal courts, following the Supreme Court's dictate in M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), enforce forum selection clauses designating a foreign court unless the clauses are unreasonable or violate public policy. George, supra, at 928. Likewise, New Jersey courts enforce forum selection provisions unless they are the result of "fraud or coercive bargaining power, or where enforcement would violate strong public policy of the local forum ... or where enforcement would be seriously inconvenient for the trial." Shelter Systems Group Corp. v. Lanni Builders, Inc., 263 N.J.Super. 373, 375, 622 A.2d 1345 (App. Div.1993). In keeping with the overriding concern of fundamental fairness to the parties, we have recognized that the enforceability of forum selection clauses turns on the requirements of notice and reasonableness. Copelco Capital, Inc. v.. Shapiro, 331 N.J.Super. 1, 5, 750 A.2d 773 (App.Div.2000).
International comity cases involving an enforceable forum selection clause choosing a foreign forum uniformly have resulted in dismissal of the federal action. See, e.g., Haynsworth v. The Corporation, 121 F.3d 956, 963 (5th Cir.1997), cert. denied, 523 U.S. 1072, 118 S.Ct. 1513, 140 L.Ed.2d 666 (1998) (dismissing Texas action in deference to British action); Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 325-27 (9th Cir.1996) (dismissing Arizona action in deference to Mexican action despite the plaintiff's fear of returning to Mexico for trial); Ensign-Bickford Co. v. ICI Explosives USA, Inc., 817 F.Supp. 1018, 1032-33 (D.Conn.1993) (dismissing Connecticut action in deference to Canada action filed on the same day); Ronar, Inc. v. Wallace, 649 F.Supp. 310, 315, 318-19 (S.D.N.Y.1986) (dismissing that portion of action dealing with claims controlled by a forum selection clause designating West Germany as the agreed upon forum, but refusing to dismiss claims against the defendant who was not a party to the contract because the federal action was filed before the West German action).
Another factor that is considered as meeting the "exceptional circumstances" test resulting in a stay or dismissal is the *614 "reactive suit," an action filed by the defendant in a prior proceeding, which is found to be "motivated by a desire to delay the progress of the case; to impose travel burdens on one's adversary; to take advantage of procedural opportunities available in only one forum; to obtain the supposed advantages of being a plaintiff; to avoid perceived prejudice in the original forum; or to benefit from perceived prejudice in the second forum." Lumen, supra, 780 F.2d at 693-94.
We conclude from the above analysis that plaintiffs' contention, that application of international comity requires us to exercise concurrent jurisdiction when the earlier action is filed outside the sovereign, is contrary to the current federal point of view. With the exception of the allocation of burden of proof regarding proof of applicable and appropriate factors, the principles of comity announced in American Home Products and those which embrace federal abstention in matters of international comity are the same. At the risk of being overly simplistic, the differences deal with the mode in which to proceed with a legal right as opposed to the law defining the right. State v. Mandara, 183 N.J.Super. 299, 303, 443 A.2d 1090 (App.Div.1982). See also Busik v. Levine, 63 N.J. 351, 364, 307 A.2d 571 (1973), appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). It embraces a procedural difference concerning the mechanics of how to reach a determination, not a substantive standard. In both systems the substantive standards are the same. We, therefore, conclude that Judge Miniman's use of the framework conceptualized in American Home Products to resolve questions embracing international comity was appropriate.

III
We move on to consider plaintiffs' assertions that Judge Miniman mistakenly exercised her discretion in applying the principles of comity pursuant to our decision in American Home Products. We consider plaintiffs' contention seriatim. Plaintiffs first contend that defendants failed to establish two of the predicate facts, namely (1) that both cases involve the same parties, claims and legal issue and (2) that plaintiffs will have the opportunity for adequate relief in the Venezuela litigation. Plaintiffs maintain that in the domestic action the defendants are the four lead reinsurers, while the Venezuela action was instituted by Oriflama, a shell corporation created by the reinsurers, which has no capital thereby enabling the reinsurers to avoid legal costs that might be awarded plaintiffs in the event they are successful before the Venezuela court. In reaching her conclusion that the reinsurers, defendants and Oriflama were substantially the same, Judge Miniman observed:
The undisputed facts here are straightforward. All of the claims or interests which the Reinsurers ever possessed against Exxon and Fluor arising out of the Amuay fire have been assigned to Oriflama, a corporation whose only assets are the various choses in action assigned to it relating to the Amuay fire together with a small sum of paid-in capital. Its only business is prosecuting the Venezuela litigation. Those are the claims that Oriflama has been litigating with Exxon and Fluor in Venezuela since 1991. Because Oriflama is the assignee of the Reinsurers' rights, a decision in the Venezuela action with respect to these claims would necessarily preclude any action by the Reinsurers or by Exxon or Fluor on those claims, even if the claims were somehow assigned by Oriflama back to the Reinsurers. (Citations omitted.)
*615 Judge Miniman correctly pointed out that her findings that the parties were substantially similar were consistent with established case law bearing upon international comity, see, e.g., Finova Capital Corp., supra, 180 F.3d at 898-99; Continental Time Corp. v. Swiss Credit Bank, 543 F.Supp. 408, 409-10 (S.D.N.Y.1982), as well as our own. See, e.g., Robinson-Shore Dev. Co. v. Gallagher, 26 N.J. 59, 73-74, 138 A.2d 726 (1958); Ajamian v. Schlanger, 14 N.J. 483, 487-89, 103 A.2d 9, cert. denied, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954).
Plaintiffs argue that the reinsurers, by creating Oriflama, have protected themselves from liability in the event they are successful in defending the Venezuela suit. They maintain that the action here, which asserts a claim against the reinsurers, who have stipulated that they would fund fees, costs and expenses incurred by or imposed on Oriflama arising from the Venezuela action, is substantially different because Oriflama has no assets and a claim for costs of litigation against the reinsurers is not part of the Venezuela action. We note that in their appellate brief, defendants have conceded the following stipulation:
[I]n the hypothetical event that Oriflama should lose the Venezuelan action and Exxon be awarded costs, under the terms of the assignment agreements with Oriflama, the Reinsurers are, in fact, obliged to put Oriflama in funds for the `fees, costs and expenses' incurred by or imposed on Oriflama arising from the Venezuela litigation.
The assignment agreement, however, specifies:
SECOND: In payment of this Assignment, ORIFLAMA shall transfer to IRI an amount proportionate to its interest in the amounts received from third parties arising out of any litigation or settlement of the rights, claims and interest so assigned, transferred and ceded, less an amount determined in due time by the then Executive Director of Cunningham IAP that shall include fees, costs and expenses (but in no event shall be less than the costs and expenses) incurred by ORIFLAMA in pursuing such rights and claims. [Emphasis added].
Judge Miniman was justified in finding that the Venezuela court had disposed of the issue insofar as it related to Oriflama by its ruling that the issue of reimbursement was not ripe for review. Although we agree with her analysis that the issue of the reinsurers liability for plaintiffs' litigation expense is hypothetical and not an actual controversy, we find nothing in the record to indicate that the consent judgment she referred to, reflecting defendants' admitted stipulation, has ever been entered. The absence of such a consent obligation might provide grounds upon which plaintiffs might apply to reopen the dismissal if future circumstances merit such an application. Cogen Technologies, supra, 241 N.J.Super. at 274, 574 A.2d 1018. We comment further on this aspect in our later discussion of the reasons for entering a dismissal without prejudice.
Plaintiffs' contention that the claims they raise concerning the alleged taint to the Venezuela proceedings resulting from Oriflama's presentation of Leonard's testimony and Cresswell's release of confidential information represent dissimilar claims, is equally misplaced. Plaintiffs essentially argue that these taints will make any Venezuela judgment unenforceable here. We agree with Judge Miniman's finding that "[h]ypothetical concerns about the enforceability of potential judgments in the later-filed forum are simply not grounds for entertaining a parallel proceeding in the United States." This is especially true where, as here, the Venezuela *616 court has yet to dispose of these very issues on appeal. We should not interfere with a sovereign's right to decide issues brought before its own judicial forum. Basic v. Fitzroy Eng'g, Ltd., 949 F.Supp. 1333, 1341 (N.D.Ill.1996), aff'd, 132 F.3d 36, 1997 WL 753336 (7th Cir.1997). If plaintiffs prevail in Venezuela these issues concerning alleged taint will be moot. If, on the other hand, they do not prevail, plaintiffs will be afforded the opportunity to argue the same points at a later date in its defense of an enforcement action. "The more prudent and correct vehicle for [plaintiffs] to use in raising these claims is not by way of the instant Complaint, but to place the same contentions within the four corners of a pleading in response to an anticipated enforcement action." Ibid.
Generally, the refusal to stay or dismiss actions due to the dissimilarity of claims in parallel litigation have involved substantially different claims, some of which could not be litigated in the foreign court because they were based on United States statutory law. For example, in Madanes, supra, 981 F.Supp. at 249, 264, the Swiss action involved an attachment of property and a contractual claim, whereas the federal district court action involved fraud charges and RICO claims. In Eskofot, supra, 872 F.Supp. at 90, the English case involved a breach of contract claim, whereas the federal district court case involved American antitrust law. Here, the only new claims asserted by plaintiffs are either purely hypothetical or are the subject matter of issues currently before the Venezuela court. Simply put, the issues raised by plaintiffs do not constitute dissimilar claims or legal issues.
Likewise, we agree with Judge Miniman's findings that plaintiffs will have the opportunity for adequate relief in the Venezuela litigation. In disposing of plaintiffs' contention that adequate relief was not available, the judge stated:
The Exxon Affiliates also seek to impugn the fairness of the Venezuelan proceedings through the allegation that they were unfairly deprived of the right to cross-examine one of Oriflama's witnesses, Lawrence Leonard: "ESC, ER & E and ESV were deprived of the right to cross-examination [of] a critical witness whose direct testimony is part of the record of the case." It is, however, clear that the Exxon Affiliates knew for over two years that Mr. Leonard had been designated to testify in Venezuela, yet waited until 48 hours before Mr. Leonard's appearance in the Venezuelan court to obtain an order, ex parte, from a federal court in Virginia, enjoining Mr. Leonard from testifying in Venezuela. The Exxon Affiliates chose to so proceed rather than to exercise their right to cross-examine Mr. Leonard in Venezuela. Any prejudice to the Exxon Affiliates was a result of these litigation tactics, not any lack of due process afforded them by the courts of Venezuela.
Once Mr. Leonard took the stand and ratified the report, the Exxon Affiliates could then have asked the U.S. court to lift its injunction on Mr. Leonard so that when he returned to court in Venezuela the following day, as scheduled, there would have been no prohibition to Mr. Leonard's undergoing cross-examination. Exxon, however, chose not to do this, electing instead to proceed with its U.S. deposition, as it did on November 7. Accordingly, when he appeared again on November 3, Mr. Leonard again professed his inability to testify due to the order of the U.S. court.
There was obviously no surprise to Exxon that Mr. Leonard would testify in Venezuela; not only had his expert report been on file with the court for over two years, but Exxon and Fluor had *617 both objected to that report by name in October 1992. At any point from 1992 through 1994, Exxon and Fluor could have undertaken a deposition of Mr. Leonard in the United States pursuant to 28 U.S.C. § 1782 in the same way as Exxon chose to do at the last-minute in November 1994. Exxon also could have foregone its U.S. deposition and cross-examined Mr. Leonard in Venezuela. Exxon and Fluor cannot claim the absence of a fair proceeding in Venezuela when any prejudice to them was entirely self-inflicted. Indeed, Exxon's and Fluor's objections to Mr. Leonard's report are on record in the Venezuelan action and are currently before the trial court pending decision. The Venezuelan judiciary is competent to address these issues without the supervision of a United States court.
As to the alleged "disdain" with which the Venezuelan judges greeted the injunction of Judge Turk, this court too would have felt, and possibly expressed, irritation over a litigant disrupting the presentation of evidence in the middle of trial by obtaining an ex parte order from another court enjoining a witness on the stand from testifying. Nothing in the record demonstrates that the judicial pique was some basic hostility to the courts of the United States rather than mere irritation at the disruption caused by the defendants in Oriflama. In any event, even if "disdain" can be said to properly characterize the mental state of the Venezuelan judge, it was a reaction caused by the Exxon Affiliates' last minute application.
Having conceded that the Venezuelan system of justice is adequate, the Exxon Affiliates cannot be heard to complain about the piques and irritations of litigation in a particular case. Surely many trials in New Jersey and its sister states have records that both sides to any piece of litigation could use to support similar claims of "bias," impatience, and irritation. Litigation generally is not the most cordial of civilized endeavors and the patience of judges is not inexhaustible. Having conceded that the system was adequate, the Exxon Affiliates will have to rely on that system to redress any outcome-determinative unfairness which may, or may not, have occurred at the trial level. The same must be said of the allegedly misleading documents. The cross-fire of litigation is designed to reveal the truth. The deposition of Cresswell and the dispute over these documents has been placed before the Venezuelan court, and it should decide the dispute over them.
In sum, the cited "injustices" are simply far too slender a reed to deprive the Venezuelan courts of jurisdiction to decide a peculiarly Venezuelan controversy. The Exxon Affiliates have had resort to the appellate courts in Venezuela in the past and when a decision is made in the Oriflama action, they may have resort to it again if Oriflama prevails. (Footnote omitted.)
Plaintiffs' arguments to the contrary lack merit. R. 2:11-3(e)(1)(A) and (E).

IV
We next consider the issues raised by plaintiffs concerning the existence of "special equities" and the contention that Judge Miniman mistakenly exercised her discretion in finding that they were not sufficiently compelling to allow the action to proceed. Absent a clear abuse, we are obligated to sustain a trial judge's exercise of discretion. Gosschalk, supra, 48 N.J.Super. at 579, 138 A.2d 774. Our review of the record satisfies us that Judge Miniman weighed the special equities urged by plaintiffs and properly found that they favored dismissal.
*618 Although plaintiffs correctly point out that ER & E and ESC, have a strong presence in New Jersey, Judge Miniman aptly noted that a comparison of both actions leads to the inevitable conclusion that Venezuela's connections to the litigation are "immediate and substantial," while New Jersey's are "remote." She correctly noted the following:
(1) [T]he Amuay Refinery, the situs of the fire, is located in the Republic of Venezuela; (2) Exxon's and Fluor's contracts were entered into with agencies of the Venezuela government: PDVSA, the Venezuela state oil company and Lagoven, PDVSA's affiliate; (3) Exxon's and Fluor's contracts are all governed by Venezuelan law; (4) Exxon Services Co. agreed that Caracas, Venezuela would be its "special and Exclusive domicile" for purposes of all disputes arising out of its contract with PDVSA; (5) Exxon and Fluor contracted to perform services at the Amuay Refinery in Venezuela; and (6) the extensive damage from the fire at the Amuay Refinery occurred in Venezuela.
The establishment of principal places of business though incorporated elsewhere, does not create, in and of itself, a sufficient nexus where the subject matter and damages occurred in a foreign jurisdiction. Bass, supra, 336 N.J.Super. at 457, 765 A.2d 247. The fact that the Flexicoking process was developed in New Jersey and much of the technical assistance was offered out of ER & E's local office is offset by the simple fact that the final application and focus of the technology was the Amuay Refinery.
There are, of course, other factors that weigh heavily in favor of defendants and against the existence of special equities. The parties to the Technical Assistance Agreement and the Agreement to Assign Personnel subjected themselves to the jurisdiction of the Venezuela courts and chose the city of Caracas as "special and exclusive domicile." Additionally, they provide that each agreement will be exclusively governed by the laws of Venezuela. We need not determine whether these clauses establish jurisdiction to the exclusion of others. See Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A., 760 F.2d 390 (2nd Cir.1985). However, they are relevant and play an important part in our comity analysis. The reliance upon Venezuela law and the clear expectations that disputes would be litigated in Caracas militate against the existence of special equities in favor of plaintiffs. Argueta, supra, 87 F.3d at 325-27; Ensign-Bickford Co., supra, 817 F.Supp. at 1032-33.
We are satisfied that Judge Miniman, to whom this case was assigned "for all purposes," was fully familiar with its status and plaintiffs' claims to the contrary concerning the case's readiness for trial lack merit. Her findings that the Venezuela action was more advanced are unassailable.
Fairness to the parties also requires that we yield to the Venezuela action. The parties agreed that Venezuela law governs. Thus, Venezuela is the more appropriate forum. Bass, supra, 336 N.J.Super. at 457, 765 A.2d 247. Even if we were to agree with plaintiffs' protestations concerning what they allege to be unfair treatment by the Venezuela court, which we do not, it would be offensive to accede to plaintiffs' contentions. To do so would require us to second guess the rulings of a foreign forum before it has made its final determination, much less afforded the litigants an opportunity to exhaust the forums appeal procedures. Basic, supra, 949 F.Supp. at 1340-41. New Jersey's strong policy against vexatious and oppressive multiple litigation is served, not thwarted, by the dismissal of the subject *619 lawsuit, which can best be described as preemptive in nature. Bass, supra, 336 N.J.Super. at 457, 765 A.2d 247. Likewise, the federal courts have found exceptional circumstances exist when the nature of the claim is vexatious or contrived. Calvert Fire Ins. Co. v. American Mutual Reinsurance Co., 600 F.2d 1228, 1234 (7th Cir.1979). Our interference, which would be tantamount to engaging in passing upon the validity of another court, might serve to "hinder the conduct of foreign affairs." Basic, supra, 949 F.Supp. at 1341 (citing W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp. Int'l, 493 U.S. 400, 404, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990)). We are satisfied that the litigation here amounts to a reactive suit, which includes those which are "motivated by a desire ... to avoid perceived prejudice in the original forum; or to benefit from perceived prejudice in the second forum." Lumen, supra, 780 F.2d at 693-94. The dismissal here avoids vexatious and oppressive multiple litigation. Ibid.
Plaintiffs' contention that the ruling of the Venezuela court, denying ESC the right to arbitrate pursuant to the arbitration provision of the Process Guarantee Agreement, violates our public policy favoring arbitration is also without merit. The clause in question was specifically limited to differences of a technical nature arising under the agreement. It further provided in paragraph 10.03 that "the arbitrator shall be empowered only to determine whether the guarantees of Paragraph 2.01 have been met," not to "award any direct, consequential, exemplary or punitive damages." Paragraph 2.01 guarantees coke yields of specific amounts during the test run of the Flexicoking Unit.

V
Plaintiffs assert that the dismissal with prejudice as reflected by the order was error. We agree. The order prepared by defendants and signed by Judge Miniman specifically designated the dismissal to be with prejudice. However, there was nothing in the judge's written opinion or the record designating that the dismissal as one with prejudice. Generally, a dismissal with prejudice operates as an adjudication on the merits. R. 4:37-2(d). A dismissal based upon the inability of a court to entertain a matter, such as lack of jurisdiction, does not represent an adjudication on the merits thereby precluding a subsequent action. R. 4:37-2(d); Watkins v. Resorts Int'l Hotel & Casino, Inc., 124 N.J. 398, 416, 591 A.2d 592 (1991). Therefore, the dismissal entered to the extent that it was predicated in part on the forum selection clause should have been without prejudice as it did not operate to adjudicate the merits, but instead was premised upon consent jurisdiction.
Likewise, the dismissal of the complaint predicated on the application of comity was not an adjudication on the merits. The decision to stay an action for comity reasons is subject to the exercise of sound discretion. American Home Products, supra, 286 N.J.Super. at 33, 668 A.2d 67; Gosschalk, supra, 48 N.J.Super. at 579, 138 A.2d 774. We have recognized that a dismissal subject to affording a plaintiff the right to reopen, depending upon future events, is a proper disposition when exercising discretionary power to yield to an early filed action. Yancoskie, supra, 78 N.J. at 324, 395 A.2d 192; Cogen Technologies, supra, 241 N.J.Super. at 274, 574 A.2d 1018. Here, plaintiffs correctly point out that the reinsurers' stipulation that they would fund fees, costs and expenses imposed on Oriflama has not been reduced to a consent judgment as apparently assumed by Judge Miniman. If plaintiffs are successful in the defense of the Venezuela action, they should be afforded *620 the opportunity to petition to reopen the present action to take advantage of defendants' stipulation, which has, to date, not been made the subject matter of a consent order or judgment.

VI
Lastly, we consider plaintiffs' assertion that Judge Miniman erred in entering a dismissal in favor of CIGNA. We have considered plaintiffs' contentions and supporting arguments and are satisfied they are without merit, and further discussion in a written opinion will have no precedential value. R. 2:11-3e(1)(A)(E). We are satisfied that Judge Miniman properly applied the standard set forth in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995). Because we modify the dismissal entered against the remaining defendants to one without prejudice and subject to a future application to reopen, the dismissal in favor of CIGNA operates as an order for partial summary judgment. Siren v. Behan, 224 N.J.Super. 130, 135-36, 539 A.2d 1244 (App.Div.1988). It is not a final judgment and is subject to revision prior to final judgment, pursuant to R. 4:42-2.
We affirm the dismissal of plaintiffs' complaint upon comity grounds and modify the order to reflect the entry of a dismissal without prejudice, consistent with this opinion.
NOTES
[1] The order to intervene is not included in the record supplied with this appeal.